**In re The LEEK CORPORATION, Debtor.**

**Bankruptcy No. 85–684–ORL–BK–7.**

United States Bankruptcy Court,
M.D. Florida,
Orlando Division.

Aug. 22, 1985.

Donald Christopher, Orlando, Fla., for petitionary creditor.

Jeffry Jontz, Orlando, Fla., for debtor.

GEORGE PROCTOR, Bankruptcy Judge.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter came on to be heard on July 31, 1984, for trial before the Court, without a jury. After consideration of the evidence produced by the parties at the trial, the Court makes the following findings of fact and conclusions of law:

#### Findings of Fact

1. The Leek Corporation (Leek) is a corporation performing general construction contracting services. The company has performed work in the states of Georgia and Florida, including projects for both public and private owners. In 1985, however, its work has been exclusively in Florida.

2. Leek regularly uses subcontractors to perform portions of its work. Leek primarily uses written subcontracts in its contractual arrangements with its subcontractors. These subcontracts expressly provide that Leek is not required to pay subcontractors until the owner pays Leek. (See Article V and Exhibit E to typical subcontracts, Debtors Exhibits 17B, 18B and 19B).

3. In addition, Leek purchases materials from vendors. In some cases Leek issues written purchase orders which provide that the vendors are due payment for goods supplied only after Leek is paid by the owner for the materials supplied to a job. In other cases, the vendor terms vary, based upon the particular terms of the vendor.

4. Leek normally submits its request for payment to project owners on the 25th of the month. Invoices received from subcontractors and materialmen between the 1st and 23rd of a particular month are incorporated by Leek in its request for payment to the owner. Under normal circumstances, Leek receives its payment from an owner 30 to 45 days after it submits its request for payment to the owner. Leek normally pays the subcontractors and materialmen on the 30th of the month, after receiving payment from the owner. Invoices received by Leek from subcontractors and materialmen after the 23rd of a particular month are too late to be incorporated into Leek's 25th requisition for payment to the owner, and therefore any invoices received from the 24th to the last day of the month are not incorporated in Leek's requisition for payment until the 25th of the following month.

5. In 1985, Leek has performed general contract services for the following projects having the following contract values:

   a. Lions Building at Daytona Beach Community College, $131,872.00.

   b. Stewart Treatment Center, Daytona Beach, Florida, $263,864.00.

   c. Information Kiosk at the University of Central Florida, Orlando, Florida, $52,340.00.

   d. Field Laboratory at the University of Central Florida, Orlando, Florida, $73,897.00.

   e. Hidden Beach Recreation Complex, Orlando, Florida, $110,000.00.

   f. Construction of houses on six lots for Co-Equity Group (Co-Equity), owner, in Winter Springs, Florida, $209,806.00.

6. All projects listed in paragraph 5 are 100% bonded to protect materialmen and subcontractors, except the Hidden Beach and Co-Equity projects.

7. All projects, except one, have been proceeding normally in 1985, with only the usual construction problems. The one exception is the project involving the six Co-Equity lots. Here Leek and Co-Equity, in February 1985, fell into a serious and prolonged dispute over the performance of duties by Leek, and the disbursement of funds by Co-Equity to Leek. This resulted in Co-Equity terminating Leek's performance on the project, and the filing of a lawsuit in Seminole County, Florida in April 1985. When Leek was ordered to remove itself from the Co-Equity Project, and Co-Equity suspended payments to Leek pending resolution of the dispute, Leek advised its subcontractors and materialmen that it had not been paid on the project, and under its agreements it could not pay its subcontractors and materialmen. Leek urged the subcontractors and materialmen to file mechanics' liens, under Section 713.01 et seq. of the Florida Statutes, in order to protect their interest. Most subcontractors and materialmen filed mechanics' liens on the Co-Equity Project.

8. On May 21, 1985, Co-Equity and Leek settled their dispute with an agreement that Co-Equity would pay directly all subs and materialmen of Leek where there was no dispute over the right of the subcontractors and materialmen to be paid. Where Co-Equity or Leek disputed the statements of subcontractors and materialmen, Co-Equity agreed that it would transfer the claims of subcontractors and materialmen to a bond pending resolution of the matter. (See Debtor Exhibit 6B) The total amount owed materialmen and subcontrac-

tors by Leek on the Co-Equity job, prior to the settlement on May 21, 1985, was $31,422.52. Many of the subcontractors and materialmen have now been paid directly by Co-Equity.

9. On May 23, 1985, this Involuntary Petition was filed by four creditors. The Court initially found that three of the first four petitioning creditors were unqualified. Three additional creditors then sought to join the petition, two of which later requested permission to withdraw, which was denied by the Court. The primary impetus for this Involuntary Petition has been the dissatisfaction by creditors who remain unpaid on the Co-Equity project.

10. The most recent financial statement of Leek establishes current assets of $697,949.00, property and equipment of $91,369.00, and other assets of $1,515.00, for total assets of $790,833.00. Current liabilities total $427,021.00, and long term liabilities total $12,482.00. Total stockholders equity totals $351,330.00. The balance sheet also reflects contingent liabilities in the form of construction disputes of $256,853.00, and contingent assets in the form of claims by Leek against others for construction projects of $942,906.00. (Debtor's Exhibit 2B).

11. The bank statements for Leek for 1985 show a high balance of approximately $46,000.00, and a low balance of approximately $1,000.00, with normal fluctuation in between. The bank statements reflect no overdrafts, and testimony from the president of Leek confirmed that there had been no overdrafts in 1985. (Creditors' Exhibits 6B and 7B)

12. The company's rent, utilities, vehicle payments, and insurance payments have all been paid on a current basis in 1985. The company does, however, owe approximately $26,000.00 for withholding taxes for the first and second quarters of 1985. The company has employed 5 or 6 persons regularly and directly on its payroll during 1985, and all salaries have been paid timely each week.

13. Excluding the 14 creditors owed $31,422.52 on the Co-Equity job prior to the settlement with Co-Equity, Leek has paid 97% of all *dollars invoiced* within sixty days of the invoice date (irrespective of the date the invoice was received by Leek). Thirty Three percent (33%) of the invoices were paid within 15 days, 55% within 30 days, and 88% within 45 days. Similarly, by *number of invoices received,* Leek paid 33% within 15 days, 46% in 30 days, 81% in 45 days, and 95% in 60 days. (Debtor's Exhibits 11B and 13B).

14. Excluding the Co-Equity job, $93,899.00 worth of invoices out of $97,405.00 worth of invoices received, have been paid by Leek within 60 days. $31,978.00 of invoices were paid within 15 days, $52,976.00 worth of invoices were paid within 30 days, and $84,704.00 of invoices were paid within 45 days. (Debtor's Exhibit 12B).

15. Even on the troubled Co-Equity job, before Co-Equity terminated Leek, 83% of invoices were paid within 15 days, and 91% of invoices were paid by Leek within 30 days of invoice date. (Debtor's Exhibit 14B).

16. In 1985, the Leek Corporation has been involved in 10 law suits in Georgia arising out of pre-1985 work, most significantly work at the King's Bay Submarine Base in southeast Georgia. The cases have either been settled to the satisfaction of Leek and its bonding company, United States Fidelity and Guaranty, or Leek has good faith defenses to the actions. (Creditors' Exhibits 4B and 5B; Debtor's Exhibits 8B and 9B).

17. At the trial of this case, the petitioning creditors called 15 creditors who testified they were owed money by Leek. However, of those 15 witnesses called by the creditors, 8 testified that they had been paid by Leek or Co-Equity, were satisfied with Leek's payment record, or were satisfied with the agreement for Co-Equity to pay them under the settlement agreement with Leek. The remaining 7 creditors were owed a total of $6,643.27, and 6 of those creditors testified that they had filed valid mechanics' liens against the Co-Equity property and expected to be paid in the

near future when Co-Equity sold the lots upon which they had filed their liens.

### Conclusions Of Law

1. This case arises under Title 11, United States Code, Section 303, and the Court has jurisdiction.

2. Were it not for the problems on the Co-Equity job, it is unlikely this case would have been filed. It is obvious that the dispute between the owner and Leek impacted the payment to Leek's subs and materialmen on the Co-Equity job, and that is the primary genesis of this action.

3. However, the Bankruptcy Code requires a finding that a Debtor is "generally not paying" its debts as they become due. The Code does not define "generally not paying", and Collier's points out that a court must find more than a prospective inability for a Debtor to pay only a few of its debts, and more than a past failure to pay a few of such liabilities. 2 Collier on Bankruptcy, Paragraph 303.12[4] (15th Edition 1985), quoting the Report of the Bankruptcy Commission.

4. In order to determine if a Debtor is "generally paying", the Court must compare the number of debts unpaid each month to those paid, the amount of the delinquency, the materiality of the non-payment, and the nature of the Debtor's conduct of its financial affairs. See *In Re: Reed*, 11 B.R. 755, 4 C.B.C.2d 934 (Bkrtcy. S.D.W.Va.1981); *In Re: All Media Properties, Inc.*, 5 B.R. 126, 2 C.B.C.2d 449 (Bkrtcy.S.D.Texas 1980).

5. Considering all of the factors in the immediately proceeding paragraph, it is clear that Leek is generally paying its debts as they become due:

a. As pointed out above, with the exception of the Co-Equity job, Leek has paid 95% of its invoices within 60 days of the invoice date.

b. Likewise, 97% of the total dollars invoiced Leek have been paid within 60 days, excluding only the Co-Equity job.

c. The only significant problem which Leek has had is with the Co-Equity job, and the dispute there provides a rational explanation for non-payment of the Co-Equity debts pending resolution of the dispute with Co-Equity. Moreover, the total number of creditors on the Co-Equity job, and the total dollars unpaid, is relatively small compared with Leek's overall operation.

d. Here the Debtor has an apparently normal ongoing construction business, with no record of selling assets in a liquidation fashion, or making unusual transactions. There is no record of repeated overdrafts. The Debtor is paying its usual monthly obligations in a normal and timely fashion.

6. The Court finds that the Leek Corporation is generally paying its debts as they become due, except those which are subjects of bona fide disputes, as those terms are defined in Title 11, U.S. Code, Section 303(h)(1) of the Bankruptcy Code.

7. The Court will enter a separate order in accordance with these Findings of Fact and Conclusions of Law.