**In re BETTER CARE, LTD.,**
**Alleged Debtor.**

**Bankruptcy No. 88 B 2658.**

United States Bankruptcy Court,
N.D. Illinois, E.D.

March 1, 1989.

Chuhak, Tecson, Kienlen, Feinberg & Green, Chicago, Ill., for petitioning creditor.

Hollander & Hollander, Chicago, Ill., for alleged debtor.

## MEMORANDUM OPINION AND SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

ERWIN I. KATZ, Bankruptcy Judge.

This action was originally commenced by the filing of an involuntary petition under Section 303 of the Bankruptcy Code, 11 U.S.C. 303, against Better Care, Ltd., the alleged debtor (Better Care).

On May 27, 1988, this Court entered Findings of Fact and Conclusions of Law (Findings), after trial, finding that the involuntary petition filed in this cause should be dismissed. On July 14, 1988, this Court found, after additional hearings, that the petitioning creditors acted in bad faith in bringing the involuntary petition. This Court reserved jurisdiction as to the question of damages and sanctions. The Findings of Fact and Conclusions of Law are attached as an Appendix to this Memorandum Opinion (Opinion). This Opinion shall constitute Supplemental Findings and Conclusions pursuant to Rule 7052.

### HISTORY

Better Care, Ltd., a corporation, was formed in 1986. Its purpose was to engage in the business of supplying occupational and physical therapy to various patients in

need of their services. Better Care was formed by Dr. Alfred Akkeron (Akkeron), an orthopedic specialist, and Angela Sarno (Sarno), a physical therapist.

Pursuant to their agreement, Akkeron agreed to refer patients to Better Care for therapy. He also agreed to provide the necessary start-up financing for Better Care. Akkeron loaned funds to Better Care and also guaranteed Better Care's loans from third parties. Better Care operated its business at 1812 North Broadway, Melrose Park, Illinois. That building was originally owned by Broadway Land Development Company (Broadway Land) and was later transferred to Broadway Real Estate Corporation (Broadway Realty), under a restructuring of Akkeron's financial affairs. Akkeron was the sole owner of both corporations.

Evans, Marshall & Pease, P.C. (EMP) is a corporation engaged in the business of providing certified public accounting services. It has been the certified public accountant for Akkeron and his various entities as well as for Better Care.

On February 22, 1988, this involuntary petition was filed by Akkeron, Broadway Land[1] and EMP, as petitioning creditors, against Better Care. That petition was resisted and defended by Better Care and Sarno. First American Bank of DuPage (Bank), an equipment financing creditor, initially joined in the petition, but later withdrew. The petition was dismissed after an evidentiary hearing.

In the Findings, this Court found that Akkeron did not qualify as a petitioning creditor under Section 303(b) because his claims against Better Care were contingent as to liability. The remaining creditors, EMP and Broadway Realty, did not satisfy the requirements of Section 303(b) as to the aggregate amount in claims. This Court also found a total lack of evidence that Better Care was generally not paying its debts as such debts became due for purposes of Section 303(h)(1). The petition was dismissed pursuant to the Debtor's Motion For A Directed Finding.

This Court reserved the issue of bad faith under Section 303(i)(2) for subsequent ruling. On July 14, 1988, this Court found that each petitioning creditor acted in bad faith in bringing the involuntary petition. A further hearing on the issue of damages was set for early November 1988. That hearing was held on the Debtor's petition for an award of costs and attorney's fees, plus actual and punitive damages, under Section 303(i)(1)(A) and (B) and Section 303(i)(2)(A) and (B).

## I. *Generally Not Paying Debts As They Become Due*

At the trial of the petitioning creditors' involuntary petition, held in May 1988, Debtor moved for a directed verdict at the close of petitioning creditors' evidence. One of the grounds for that motion was that the petitioning creditors failed to produce sufficient evidence that Better Care was generally not paying its debts as such debts became due, within the meaning of Bankruptcy Code Section 303(h)(1). This Court granted that motion on several grounds and dismissed the petition.

The test set forth in Bankruptcy Code Section 303(h)(1) for granting an involuntary petition is that "the debtor is generally not paying such debtor's debts as such debts become due." This test, which looks to equity insolvency, rather than balance sheet insolvency, represents the most significant departure of the Bankruptcy Code from the Bankruptcy Act provisions dealing with involuntary bankruptcies. H.Rep. No. 95–595, 95th Cong., 1st Sess. (1977) pp. 323–24; *See* S.Rep. No. 95–989, 95th Cong., 2d Sess. (1976) p. 34; U.S.Code Cong. & Admin.News, 1978, p. 5787; *Matter of Win–Sum Sports, Inc.*, 14 B.R. 389, 391 (Bankr.D.Conn.1981).

While Congress was not explicit regarding what factors should be considered in applying the "generally not paying" test, it is clear that the test was not intended to be applied mechanically. *See In re B.D. International Discount Corp.*, 701 F.2d 1071, 1076 (2d Cir.) *cert. denied sub nom.*, *B.D. International Discount Corp. v. Chase Manhattan Bank, N.A.*, 464 U.S.

---

**1.** Broadway Realty later substituted as a petitioning creditor in place of Broadway Land.

830, 104 S.Ct. 108, 78 L.Ed.2d 110 (1983); 2 Collier on Bankruptcy, par. 303.12 (15th ed. 1986). Instead, Congress intended the test to be applied with flexibility so as not to limit or restrict the involuntary process. *In re All Media Properties, Inc.,* 5 B.R. 126, 142–43 (Bankr.S.D.Tex.1980); *See generally,* McCoid, *The Occasion for Involuntary Bankruptcy,* 61 Am.Bankr.L.J. 195 (1987); Honsberger, *Failure to Pay One's Debts Generally As They Become Due: The Experience of France and Canada,* 54 Am.Bankr.L.J. 153 (1980); Weintraub and Resnick, *Involuntary Petitions Under the New Bankruptcy Code,* 97 Banking L.J. 292 (1980).

■ In applying the "generally not paying" test, courts have developed a two-step inquiry. The first step is to determine which debts the debtor was paying as of the filing of the petition and which debts the debtor was not paying as of that time. *See In re R.N. Salem Corp.,* 29 B.R. 424, 428 (S.D.Ohio 1983).

Once the court has determined that there are debts the debtor is not paying as they become due, the court engages in the second step of the inquiry. That step requires the court to compare the number and amount of unpaid debts with the number and amount of paid debts. That comparison is to take into account the materiality of that nonpayment as well as the debtor's general conduct of its financial affairs. *See In re The Leek Corporation,* 52 B.R. 311, 314 (Bankr.M.D.Fla.1985); *In re Reed,* 11 B.R. 755, 760 (Bankr.S.D.W.Va.1981).

This second step of the inquiry has been alternatively formulated as requiring the court to examine whether the debtor has regularly missed a significant number of payments to creditors or has regularly missed payments which are significant in amount in relation to the size of the debtor's operation. Just as the larger the operation, the larger the size of the missed payments required for involuntary relief, so also the more creditors, the larger the number of missed creditors required for involuntary relief. *In re All Media Properties, Inc., supra,* 5 B.R. at 143.

The first step of the inquiry here, therefore, is to determine which, if any, debts Better Care was not paying as of the date of filing the petition. If, indeed, as a matter of law, there were no debts which Better Care was not paying as of that date, this Court need not reach the second step of the inquiry, which, simply stated, is to determine whether the nonpayment of debt rose to the level of "generally not paying."

The evidence which the petitioning creditors did produce on this issue related to the Better Care's pattern of making late payments (1) for rent on its premises to Broadway Land, one of the petitioning creditors; and (2) to Bank on a loan to finance Better Care's purchase of equipment. The evidence established that both Broadway Land and Bank acquiesced in these late payments and further that no payment to either Broadway Land or Bank was more than one month late.

The only other debt the petitioning creditors could show had not been paid on time was the $300 quarterly billing from EMP. The evidence also tended to show that the great bulk of Better Care's debts, both in amount and in number, were being paid on time.

It is fundamental that the determination of whether the debtor is generally paying such debtor's debts as such debts become due must be made as of the date of filing the petition. *Matter of Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.,* 779 F.2d 471, 475 (9th Cir.1985); *In re Laclede Cab Co.,* 76 B.R. 687, 691 (Bankr.E.D.Mo. 1987); *In re Vincent J. Fasano, Inc.,* 55 B.R. 409, 417 (Bankr.N.D.N.Y.1985); *Matter of Win–Sum Sports, Inc.,* 14 B.R. 389, 392 (Bankr.D.Conn.1981); *In re All Media Properties, Inc.,* 5 B.R. 126, 144 (Bankr.S. D.Tex.1980). Thus, this Court has not considered evidence of Better Care's financial difficulties following the filing of the petition, whether traceable to actions of Akkeron or not.

■ At the time of the petition, the only debts in the "not paying" category, according to petitioning creditors' evidence, were the debts for rent, for the equipment financing, and for accounting services. As

pointed out, the rent and equipment financing debts were paid invariably less than one month late pursuant to a pattern of acquiescence on the part of the lessor, Broadway Land and the equipment financier, Bank. It is true that mere failure to demand payment of a debt does not necessarily excuse failure to pay it. *In re All Media Properties, supra,* 5 B.R. at 145. At the same time, where, as here, no prior demand for timely compliance had been made on Better Care, and the debt is outstanding for only a very short time, this Court should not consider that Better Care failed to pay that debt when due. *Boston Beverage Corp. v. Turner,* 81 B.R. 738, 746 (D.Mass.1987). In addition, where a creditor engages in a course of conduct allowing for late payments, as did both Broadway Land and Bank, those creditors cannot rely on such late payments to show that Better Care is not paying its debts when due. *In re Laclede Cab Co., supra,* 76 B.R. at 692. Thus, since these debts were never due for longer than a short period of time and the creditor in each case acquiesced in this payment pattern, these debts were being paid when due for purposes of Bankruptcy Code Section 303(h)(1).

Turning now to the accounting services debt, we are left with a single debt upon which to base a finding that Better Care was generally not paying its debts. There is no authority for the Court to make such a finding. It is true that the failure to pay one or more significantly large debts may serve as the basis for involuntary relief. *In re Laclede Cab Co., supra,* 76 B.R. at 691; *In re Garland Coal and Mining Company,* 67 B.R. 514 (Bankr.W. D.Ark.1986). However, the $300 accounting services debt must be considered *de minimus,* not significant, by any standard. Debts which are *de minimus,* or merely overlooked, as testified by Sarno, should not be counted in determining failure to pay debts as they become due. *In re Hill,* 8 B.R. 779, 781 (D.Minn.1981). The single accounting services debt, *de minimus* as it is, is not dispositive of whether Better Care was generally not paying its debts as such debts became due. The failure to pay a single debt, even over a long period, will

usually not justify a finding that a debtor is generally not paying its debts as they become due. *Boston Beverage Corp. v. Turner, supra,* 81 B.R. at 749; *In re Reed,* 11 B.R. 755, 760 (Bankr.S.D.W.Va.1981); *Matter of 7H Land & Cattle Co.,* 6 B.R. 29, 31 (Bankr.D.Nev.1980).

Since the only debts on which the petitioning creditors brought evidence could not be counted as a matter of law, it was not necessary for this Court to make the second *Turner* inquiry as to whether the nonpayment of debt rose to the level of "generally not paying such debtor's debts as such debts become due." This Court, therefore, granted Better Care's Motion for a Directed Verdict, dismissing the involuntary petition filed by the petitioning creditors.

## II. *Bad Faith*

This Court reserved the issue of bad faith on the part of the petitioning creditors in connection with the trial of the petition held in May 1988. The parties waived any further submission of evidence on that issue. Subsequently, on July 14, 1988, this Court made findings on that issue in open court. This Court stated as follows:

> "The cases in interpreting bad faith discuss various tests; one of which is the question of malice or ill will. The other is the more objective test, similar to the 9011 test; and some even, although they don't ever say it, use the nose test. If it smells like bad faith, it's got to be bad faith. I think the petitioning creditors in this case failed all the tests, whichever one you apply."

Transcript of Proceedings Before the Honorable Erwin I. Katz, July 14, 1988, p. 3 ("7/14 Transcript").

At the trial on the Petition for Damages, held in November 1988, the petitioning creditors for the first time submitted the testimony of Albert Grasso, counsel for Akkeron, who testified that Akkeron only filed this involuntary petition on advice of counsel. This evidence was permitted, over objection, on the bad faith issue. In order to adequately deal with this issue it is

necessary to examine the underpinnings of this Court's July 14, 1988, findings regarding bad faith.

The case law discussions of bad faith virtually all begin by setting forth verbatim the provisions of Bankruptcy Code Section 303(i):

"If the court dismisses a petition under this section other than on consent of all petitioners and the debtor and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment—(1) against the petitioners and in favor of the debtor for—

(A) costs; or

(B) a reasonable attorney's fee; or

(2) against any petitioner that filed the petition in bad faith for—

(A) any damage proximately caused by such filing; or

(B) punitive damages."

Bankruptcy Code Section 303(i) (11 U.S.C. Section 303(i)).

▇ The legislative history under this section makes clear that the use of the term "or" is not exclusive in this paragraph. The court may grant any and all of the damages provided for under this provision. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 324 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 34 (1978), U.S.Code Cong. & Admin.News, 1978, pp. 5787, 5820, 6280. *See also In re Johnston Hawks Ltd.,* 72 B.R. 361, 366 (Bankr.D.Hawaii 1987); *In re Camelot, Inc.,* 25 B.R. 861, 868 (Bankr.E. D.Tenn.1982); *In re Ramsden,* 17 B.R. 59, 61 (Bankr.N.D.Ga.1981).

Thus, this Court, having found bad faith, is empowered to award the entire panoply of damages listed in Section 303(i). However, at the same time, the award of such costs, fees and damages is not automatic, but is committed to the sound discretion of the court. *In re Johnston Hawks Ltd., supra,* 72 B.R. at 366; *In re Advance Press & Litho., Inc.,* 46 B.R. 700, 701 (D.Colo.1984). Clearly, a finding of bad faith is necessary for the award of any damages under Section 303(i)(2). *Camelot, Inc. v. Hayden,* 30 B.R. 409, 410–11, (E.D. Tenn.1983).

In defining bad faith, courts have taken varying approaches. One line of authority finds bad faith to exist where the filing of the petition was motivated by ill will, malice or for the purpose of embarrassing or harassing the debtor. This might be considered the "improper purpose" test. *See In re Laclede Cab Co., supra,* 76 B.R. at 693; *In re Johnston Hawks, Ltd., supra,* 72 B.R. at 366; *In re WaveLength, Inc.,* 61 B.R. 614, 620 (9th Cir. BAP 1986); *In re Advance Press and Litho, Inc., supra,* 46 B.R. at 703. An example of such bad faith can be found in *In re Camelot, Inc., supra,* 25 B.R. at 864, where the petitioning creditors were 25% shareholders and employees of the debtor corporation. Various disputes arose between the 25% shareholders and the 75% shareholders. Dissolution proceedings were filed in the state court which entered judgment adverse to the petitioning creditors. The court found that the purpose of bringing the involuntary petition was solely to frustrate the results of the state court proceeding, an act of bad faith justifying imposition of punitive damages.

Similarly here, Akkeron attempted to wrest total control of the debtor corporation from Sarno. He submitted his demands in writing. When Sarno did not accede to his wishes, this proceeding followed.

A second line of authority finds bad faith wherever a creditor's actions amount to an improper use of the Bankruptcy Code as a substitute for customary collection procedures. This might be considered the "improper use" test. *See In re Nordbrock,* 772 F.2d 397, 399 (8th Cir.1985); *Basin Electric Power Cooperative v. Midwest Processing Company,* 769 F.2d 483, 487 (8th Cir.1985); *In re Allen Rogers and Co.,* 34 B.R. 631 (Bankr.S.D.N.Y.1983); *In re SBA Factors of Miami, Inc.,* 13 B.R. 99, 100 (Bankr.S.D.Fla.1981).

It thus becomes crucial to examine what can be categorized as the proper uses of the involuntary proceedings provided for by the Bankruptcy Code.

The Court in *In re Ramm Industries, Inc.,* 83 B.R. 815, 825 (Bankr.M.D.Fla.1988)

identified two purposes of bankruptcy as (1) giving debtors a fresh start and (2) insuring an orderly ranking of creditors' claims. *See also In re Central Hobron Associates*, 41 B.R. 444, 451 (D.Hawaii 1984). Of course, an involuntary bankruptcy can be expected to be directed primarily at the second enumerated purpose, the orderly ranking of creditor claims, without much concern for the first.

Similarly, Professor Max Radin has described bankruptcy as a "method by which *all* the creditors were compelled to accept some arrangement or some disposition of their claims against the bankrupt's property, whether they all agreed to it or not." Radin, *The Nature of Bankruptcy*, 89 U.Pa.L.Rev. 1, 3–4 (1940) (emphasis in original). Expanding upon this formulation, Professor McCoid has identified three elements defining bankruptcy: "It [bankruptcy] is a (1) *coercive* and (2) *collective* judicial *process* the purpose of which is (3) *to settle creditors' claims between each creditor and the debtor and among creditors themselves*." McCoid, *The Occasion for Involuntary Bankruptcy*, 61 Am.Bankr.L.J. 195, 213 (1987) (emphasis in original). *See also* T. Jackson, *The Logic and Limits of Bankruptcy Law* (Harvard University Press, 1986).

Based upon these judicial and scholarly commentaries, this Court extrapolates that the proper purpose of a creditor filing an involuntary petition is to protect against other creditors obtaining a disproportionate share of the debtor's assets. The objective basis for the creditor's perception of disproportionate dismemberment of the debtor is linked to the pattern of the debtor not paying its debts as they became due.

■ An improper use of the Bankruptcy Code justifying a finding of bad faith will then exist any time a creditor uses an involuntary bankruptcy to obtain a disproportionate advantage to that particular creditor's position, rather than to protect against other creditors obtaining such a disproportionate advantage. This is especially true where the, petitioning creditor could have obtained that advantage in an alternate forum. *See In re Wavelength,*

*supra*, at 61 B.R. at 620 (petition filed as part of jockeying for position of corporate control).

Some courts have analyzed the bad faith issue by reference to Bankruptcy Rule 9011, patterned after Federal Rule of Civil Procedure 11. *See e.g., In re Turner*, 80 B.R. 618, 623–24 (Bankr.D.Mass.1987); *In re Laclede Cab Co., supra*, 76 B.R. at 629 n. 6; *In re McDonald Trucking Co., Inc.*, 76 B.R. 513, 516 (Bankr.W.D.Pa.1987). *See generally* Byrne, *Sanctions for Wrongful Bankruptcy Litigation*, 62 Am.Bankr.L.J. 109, 111–12 n. 17 (1988).

Rule 9011 proscribes conduct undertaken "for any improper purpose, such as to harass, to cause delay, or to increase the cost of litigation." That definition parallels the definition of the type of conduct held to constitute bad faith under the improper purpose test.

The second line of authority, however, goes further. That line of authority, the improper use test, encompasses within it bad faith conduct undertaken for purposes entirely proper of themselves, such as customary debt collection or the resolution of intranecine corporate disputes. Such conduct becomes improper only because it does not justify the particular remedy of involuntary bankruptcy.

Rule 9011, of course, also encompasses the taking of inadequately supportable positions. In that way, it is broader than either of the bad faith definitions discussed thus far. The task of determining the legal sufficiency of a position under Rule 9011 requires investigation of both the facts and the law prior to the signing and submission of a pleading. *In re McDonald Trucking Co., Inc., supra*, 76 B.R. at 516.

The level of such required investigation depends on the circumstances of the case. For example, in *In re Turner, supra*, a great deal of attorney sloppiness was excused because a petition had to be filed within hours to avoid a judgment lien against the alleged debtor as preferential. 80 B.R. at 622, 626–27. Also, an experienced practitioner is not expected to undertake exhaustive research for every new case handled, but is allowed, indeed encour-

aged, to rely on "seasoned intuition". *In re TCI Ltd.*, 769 F.2d 441, 447 (7th Cir. 1985). But an attorney proceeding in such a seat-of-the-pants fashion runs the risk that the position taken will be so far out-of-line as to justify application of Rule 9011.

■ Within these parameters, this Court's finding of July 14, 1988, that each of the creditors was guilty of bad faith by every definition, can best be understood. First of all, it should be pointed out that Broadway Realty (as well as Broadway Land, for that matter) is the wholly-owned corporation of Akkeron, so that Akkeron's motives and actions are imputable to it.

Reviewing the evidence in that context it is clear that the improper purpose test was met. There was ample testimony in the record that petitioners maliciously intended to shut down Better Care's business because of personal antipathy for Sarno.

As to EMP, this Court has found that EMP joined as a petitioning creditor not only to merely go along with whatever Akkeron, a valued client, wanted but also because they were angry at Sarno because their services had been terminated and because of her treatment of Akkeron. EMP thereby exposed itself to the same risks that attended Akkeron's actions.

Regarding the improper use test, the evidence tended to show that Akkeron was attempting to accomplish at least two non-bankruptcy purposes by filing the petition; (1) he was attempting to redirect which creditors were paid first so as to reduce his liability on his guarantees, and (2) he was attempting to obtain control of the Better Care corporation. Each of these purposes, to the extent legitimate, would have been more appropriately accomplished through a state court proceeding.

As to the Rule 9011 test, the evidence showed a lack of reasonable inquiry by both the petitioning creditors and their counsel [2] into the existence of the elements necessary for filing an involuntary petition. Attorney Grasso testified that his pre-filing

investigation amounted to no more than looking at Colliers and talking to a partner. Such a perfunctory analysis would not suffice for even a seasoned bankruptcy practitioner where the result reached was so far out-of-line. It is certainly inadequate for Grasso since neither he nor his partner has claimed any expertise in bankruptcy. Even further, Grasso testified that he may not have been given all the facts by Akkeron regarding the nature of the loans (although he posited that, in his opinion, it made no difference, since a loan payable only out of profits, such as Akkeron's loan to Better Care, was not, in his opinion, contingent). The conclusion is inescapable that Akkeron, Broadway Realty and EMP were all guilty of bad faith under every definition.

The existence of malice, spite and ill-will disposes of the defense of reliance on advice of counsel. The court in *In re Wavelength, supra*, 61 B.R. at 620, stated: "Although reliance upon counsel's advice has been held to preclude a finding of bad faith where there is an absence of evidence of malice or ill-will, *In re Advance Press & Litho, Inc., supra*, at 704, that same court refused to permit the defense for a third individual who had been motivated by ill-will and malice."

Thus, advice of counsel can excuse improper-use bad faith but it cannot excuse improper-purpose bad faith. This result follows because, where only improper-use bad faith exists, the purpose of the involuntary filing is legitimate of itself. Where the attorney advises the client that this purpose should be effectuated by an involuntary bankruptcy, it is the attorney who is responsible for the improper use, not the client. Where, however, the purpose is improper, the client will usually come into the attorney's office with that purpose already formed. It is the purpose which constitutes bad faith in such a case and it is the client who is responsible for the purpose. Here, the petitioning creditors developed their personal antipathy for Sarno, and de-

---

**2.** Rule 9011 mandates that a court, having found counsel to have violated the rule "shall impose ... an appropriate sanction...." No request for Rule 9011 findings or sanctions has

been made. Applying Rule 9011 standards to the Section 303 "bad faith" test does not mandate imposition of sanctions absent an appropriate motion. See, however, footnote 4, *infra*.

cided to act upon it, wholly independently from Grasso's advice. They cannot now hide behind that advice when the consequences of their decision are visited upon them.

Thus, before turning to the particular items of damages claimed by Better Care, this Court holds that Better Care is entitled, at least in theory, to each of the types of damages enumerated in Bankruptcy Code Section 303(i), including punitive damages.

### III. *DAMAGES AND MISCELLANEOUS ISSUES*

Better Care's petition seeks the following items of damages, in the following amounts:

| | |
|---|---|
| Attorneys' Fees | $47,394.80 |
| Costs | 3,593.44 |
| Actual Damages | 4,831.13 |
| Total | $55,819.37 |

Better Care also seeks "substantial" punitive damages.

■ The petitioning creditors first assert that the attorneys' fees are not adequately documented, were unnecessary and duplicative and generally would not pass muster under Bankruptcy Code Section 330 (11 U.S.C. Section 330). Section 330 does not deal with damages but rather with a standard for the award of fees which reduces the distribution to creditors from the estate. Fees, as assessed under Section 303, are merely an element of damages. This Court agrees with Better Care that the Section 330 standards are not necessarily

controlling, at least as to the fee petition criteria as defined in *In re Continental Illinois Securities Litigation*, 572 F.Supp. 931 (N.D.Ill.1983). The issues in *Continental* dealt with the showing required for allocation of fees to creditors and class members. The issue here is proof of damages, which need not be shown with mathematical certainty. *See In re McDonald Trucking Co., Inc.*, 74 B.R. 474, 482 (Bankr.W.D.Pa.1987); *Schatz v. Abbott Laboratories, Inc.*, 51 Ill.2d 143, 281 N.E. 2d 323 (1972). Under Section 303(i) the fees are assessed only as one of the items of damages. *See, In re Wavelength, supra*, 61 B.R. at 621–22. Although the petitioning creditors point out that the court in *Wavelength* disallowed some of the attorneys' fees, that disallowance was primarily on the grounds of inadequate documentation.

This Court need not, however, reach that issue. This Court is quite satisfied with Better Care's documentation of the claimed attorneys' fees. Furthermore, this Court notes that, while Section 330 requires that attorneys' fees be based upon actual and necessary legal services, Section 303 only requires that such fees be reasonable. Further, having observed counsel's work in the total course of this proceeding, this Court finds that a sufficient showing has been made under both Sections 303 and 330 and that the services were actual, necessary and reasonable in light of the time constraints and issues involved.

■ However, this Court agrees that some of Better Care's attorney's fees are not reasonably related to the defense of this petition. Particularly, the fees for the time spent on state court litigation and resisting an IRS levy are unrelated to the defense of the involuntary petition.[3]

**3.** The amount of such fees is as follows:

| DATE | ENTRY | TIME | AMOUNT |
|---|---|---|---|
| 7–19–88 | Telephone conf with Richard Schenker re: IRS Notice of Intent | .35 | $40.25 |
| 7–19–88 | Telephone conf with Sarno & police re: execution of replevin | .35 | $40.25 |

Therefore, this Court will reduce the amount of attorney's fees by $203.00 from $47,394.80 to $47,191.80.

Turning now to Better Care's costs and actual damages, no substantial argument has been adduced regarding the allowance of the costs. Regarding the actual damages, Better Care seeks compensation for telephone charges, tax penalties and interest and Sarno's lost time expense. This Court agrees with petitioning creditors that no connection has been shown between the telephone charges and the petition. Those charges will therefore be disallowed in full, in the amount of $344.72. The tax penalties and interest are a result of Better Care's failure to ask this Court for relief from the freeze placed on its bank account for the purpose of paying the taxes. Better Care had sought such relief to pay Sarno's salary and attorney's fees and could have sought such relief to pay the taxes as well, thereby avoiding the imposition of penalties. Thus, the failure to pay such taxes was not proximately caused by the filing of the petition. The tax penalties and interest will be disallowed in full, in the amount of $990.22.

In connection with Sarno's lost time, petitioning creditors point out that Better Care's loss of business is speculative and noncompensable since Better Care is essentially a new venture, particularly without Akkeron's patient referrals. However, these damages are based on Sarno's time spent defending the involuntary petition. This Court finds the value of Sarno's time to be adequately documented and not speculative and the loss of that time to be proximately caused by the filing of the petition. This Court will, therefore, award actual damages in the amount of $3,496.19.

We now turn to the issue of punitive damages. Better Care has adduced much evidence regarding Akkeron and EMP's net worth and Akkeron's investments and lifestyle. Akkeron, in turn, has shown that he has outstanding against him a malpractice judgment in the amount of approximately $4.3 million, with insurance coverage of only about $1 million.

The court in *In re Laclede Cab Co., supra*, 76 B.R. at 694, identified the two purposes of punitive damages as punishment and deterrence. This Court notes that the highest punitive damages award it has found in an involuntary bankruptcy context was the $15,000 awarded in *In re Laclede Cab Co., supra*. This Court also feels that the petitioning creditors have certainly gotten their hands burned in their little foray into involuntary bankruptcy and are unlikely to commit the same sins again.

Nevertheless, each of the petitioning creditors (including Broadway Realty, which acts by imputation from Akkeron) is guilty of intentionally doing a wrongful act, without just cause or excuse, in filing the petition. Therefore, some measure of punitive damages should be awarded. *See In re Laclede Cab Co., supra*, 76 B.R. at 694. This Court does not agree, however, with Better Care that the punitive damages award in an involuntary bankruptcy case, where the only damage is financial, should be of the magnitude of such awards where the damage is to the life and health of the public. This Court, therefore, holds that precedents such as *Brown & Williamson Tobacco Corp. v. Jacobson*, 644 F.Supp. 1240 (N.D.Ill.1986), cited by Better Care, are not applicable in the involuntary bankruptcy context. In view of the foregoing, this Court will assesses punitive damages in the amount of $5,000 against Akkeron and Broadway Realty, jointly and severally, and against EMP in the amount of $2,000, severally, and not jointly, since each must be judged separately.

■ The petitioning creditors have argued that Akkeron should be entitled to a set-off against any damages awarded Better Care. Better Care has responded by citing *In re Schiliro*, 72 B.R. 147 (Bankr.E.

| DATE | ENTRY | TIME | AMOUNT |
|---|---|---|---|
| 7–29–88 | Conf. with Ruggerio re: 4th Dist. Action | .75 | $93.75 |
| 8–24–89 | Review of Akkeron's Answers to Forcible and Replevin Complaints | .25 | $28.75 |
| | | 1.7 | $203.00 |

D.Pa.1987), a case which did not allow an unsuccessful petitioning creditor to set-off its claim against attorneys' fees awarded the debtor in connection with an involuntary petition in which that creditor joined. That case is limited to attorneys' fees. It would thus not preclude a set-off against costs and actual damages, the other items awarded Better Care in this case. Further, this Court does not find *In re Schiliro* to be persuasive. There is no reason why set-off should be limited nor has there been any argument or showing as to why Akkeron's right to recover on his claim should be affected.

The court in *Schiliro* advanced two arguments against set-off of debtor's attorney's fees under 303(i). The first argument is a policy argument. The award of attorney's fees to a debtor is designed, argued the court, to assure that a debtor will be adequately represented in an involuntary proceeding. A set-off would prevent the attorneys for debtor from actually getting paid, thus making it more difficult for a debtor to obtain counsel. See 72 B.R. at 149.

The second argument is a "legal" argument, *id.*, which this Court takes to mean a technical argument. It is based on the requirement of mutuality which the *Schiliro* court asserts is absent in the case of attorney's fees. This is because, while the debtor owes the creditor, the creditor owes the attorney's fees to the debtor's attorney, not the debtor. 72 B.R. at 149–50.

This Court questions both arguments. Regarding the policy argument, this Court believes the *Schiliro* court has confused 303(i) with fee-shifting statutes of the type exemplified by the Truth-in-Lending Act, 15 U.S.C. Section 1640(a)(3), relied upon heavily in the *Schiliro* opinion. Truth-in-Lending is designed to encourage actions for its violations and awards attorney's fees against the wrongdoer in pursuance of that policy. The attorney's fee award is thus essentially regulatory, designed to foster private attorneys general; such award is not primarily compensatory. Thus set-off should not be allowed to evade it. The attorney's fee award of 303(i), on the other hand, is purely compensatory, designed not to foster litigation but to discourage it. It is furthermore intended to compensate the aggrieved party in the wake of the very litigation designed to be discouraged, i.e., groundless involuntary petitions. It is thus an item of damages to the debtor akin to any other such item of damages, so set-off should be available as much for attorney's fees as for the other 303(i) items of damages.

Regarding the technical "legal" argument, relating to mutuality, this Court points out that the attorney's fees under 303(i) are clearly owed to the debtor, not the attorney. The statute says as much in 303(i)(1), by stating that "a reasonable attorney's fee" is granted "against the petitioners and *in favor of the debtor*". Furthermore, 303(i)(1)(B) does not require that the debtor pay the fees over to its attorney; the debtor may have an annual retainer arrangement with its attorney or the debtor may have used in-house counsel. In either event the attorney's fee is still payable by the petitioners.

At the same time, this Court accepts Better Care's argument that the merits of Akkeron's $51,000 claim have never been fully adjudicated. It is, therefore, premature to allow a set-off of that claim. This Court will therefore schedule a further hearing in this case, limited to the issue of the propriety of Akkeron's claim for the purpose of set-off.

Finally, the petitioning creditors have asked this Court to condition any award of damages upon Better Care's delivering a general release to the petitioning creditors. This Court finds no basis for such an order. Payment of a judgment creates a right to a satisfaction, not a release. Further, Better Care may have numerous other state or federal causes of action against the petitioning creditors, none of which would be preempted or discharged by this judgment.

This Court is aware of no authority which would allow it to deprive Better Care of any of those causes of action. Indeed, this Court perceives that Fifth Amendment due process and taking constraints bar any such deprivation. This Court will therefore

decline to order Better Care to execute any form of release and will deny the request of the petitioning creditors. This Court, however, expresses no opinion regarding the existence or merits of any additional claims of Sarno or Better Care [4] or as to the application of the principle of *res judicata* or collateral estoppel to any such claim or claims.[5]

This Court imposes the damages award, other than the punitive damages award, jointly and severally upon each and all of the petitioning creditors. Thus, all damages awarded to Better Care, except punitive damages, are imposed jointly and severally upon each and all of the petitioning creditors. This Court expresses no opinion regarding the availability of contribution and/or indemnity, particularly under the circumstance that Akkeron may be permitted to set-off his $51,000 claim.

By Separate Order this Court will award the following:

(A) Better Care shall be awarded the following amounts against the petitioning creditors, jointly and severally:

| | |
|---|---|
| Attorney's Fees | $47,191.80 |
| Costs | 3,593.44 |
| Actual Damages | 3,496.19 |
| Total | $54,281.43 |

(B) Better Care shall be awarded punitive damages of $2,000 against EMP severally and not jointly.

(C) Better Care shall be awarded punitive damages of $5,000 against Akkeron and Broadway Realty jointly but severally with respect to EMP.

---

**4.** This Court also expresses no opinion regarding any claims of petitioning creditors against their counsel for the advice given in connection with this case.

APPENDIX

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

This cause coming on to be heard on the trial of the above cause, the petitioning creditors having presented their evidence and rested their proof, the alleged debtor, Better Care, Ltd., having presented its motion for a directed finding, the court having heard the evidence, and reviewed the documents and other exhibits admitted into evidence, and being fully advised in the premises, finds as follows:

Better Care, Ltd. ("Better Care"), was incorporated in early 1986. Better Care was engaged in the business of providing physical and occupational therapy services at 1812 N. Broadway, Melrose Park, Illinois. The building housing the Better Care office was owned by Broadway Real Estate Corporation, a corporate entity owned and controlled by Dr. Alfred Akkeron (Akkeron).

This case was initiated on February 22, 1988, by the filing of an involuntary petition by the petitioning creditors Alfred A. Akkeron, Broadway Land Development Company and Evans, Marshall & Pease, P.C. On May 5, 1988, upon motion of the petitioning creditors, Broadway Real Estate Corporation was substituted as a petitioning creditor in place of Broadway Land Development Company. On May 5, 1988, the First American Bank of DuPage County presented its motion to be joined as a petitioning creditor. Said motion was withdrawn on May 10, 1988.

Akkeron claims to be owed $51,000 as and for principal and interest for loans made to Better Care. Broadway Real Estate Corporation alleges that it is the assignee of the Better Care lease entered into with Broadway Land Development and claims it is owed $3,500 as rent due on February 1, 1988, for the month of Febru-

---

**5.** *See e.g., Paradise Hotel Corp. v. Bank of Nova Scotia,* 842 F.2d 47 (3d Cir.1988) (debtor aggrieved by involuntary petition may pursue remedies outside bankruptcy court).

ary 1988. Evans, Marshall & Pease provided accounting services to Better Care from the inception of Better Care through September 30, 1987. Evans, Marshall & Pease submitted its quarterly bill in early November of 1987 and the bill remained unpaid as of the filing of the petition.

There are fewer than 12 holders of claims against Better Care.

In 1986, Akkeron and Angela Sarno ("Sarno") entered into a verbal agreement for formation of Better Care. The agreement provided that a corporation would be formed and that Akkeron and Sarno would each own 50% of the corporation. Sarno would be employed by the corporation at a salary of $35,000 per year. Akkeron would provide for the initial financing of the corporation by way of loans secured by his property and personally guaranteed by him. Such loans would be repaid to Akkeron when the corporation was making a profit prior to any division of profits between Sarno and Akkeron. Profits were to be divided equally between the two. There was no discussion concerning the manner for determining profitability nor was there any discussion as to percentage of profits to be used to make payments on the loan, the amount of reserves to be maintained, if any, or when the payments should be made after determination of profitability.

Akkeron, in accordance with his agreement, arranged for loans to be made to Better Care. Those loans were personally guaranteed by Akkeron and were collateralized by his property. In addition thereto, Akkeron loaned his personal funds to the corporation. At the time of the filing of the petition the corporation, Better Care, owed Akkeron, for advances made by him, the approximate sum of $51,000, including interest.

Subsequent to the formation of Better Care, Akkeron, who is an orthopedic surgeon, was notified by the Department of Registration and Education of the State of Illinois that he could not be a shareholder in Better Care. He intended to continue to receive his 50% of profits. There was no testimony as to any subsequent agreement between Akkeron and Sarno regarding his changed status vis a vis Better Care.

The financial statement for Better Care showed a profit for the quarter ending June 30, 1987. Additionally, there were interest expenses which were being paid by Akkeron, which interest expenses should have been charged to the corporation, and the inclusion of those interest expenses would have substantially reduced the profitability of Better Care. In August of 1987, the location of 1812 N. Broadway, Melrose Park, Illinois, suffered a flood which damaged various property of Better Care.

Under the terms of its lease, Better Care was responsible for making its monthly rental payments of $3,500 per month to Broadway Real Estate Corporation or its predecessor, Broadway Land Development company on the first day of each month. Although there were times when the monthly rental payments were timely made, most of the rental payments were paid, either fully or partially, during the course of the month after they were due. The landlord would call at the first of each month asking for the rental payments, but would accept the rental payments when they were paid. The landlord also accepted late rental payments from other tenants.

First American Bank of DuPage was a creditor of Better Care arising out of a lease financing arrangement for therapy equipment used by Better Care. The monthly payments by Better Care were paid at various times, were often late, and were accepted by the bank. No late charges were assessed for late payments. At the time of the filing of the petition, February 22, 1988, only the current payment for February of 1988 was due in the amount of $834.00.

Evans, Marshall & Pease was the accounting firm selected by Akkeron to perform the accounting services for Better Care. Evans, Marshall & Pease billed quarterly for its services. A quarterly billing was issued in the amount of $300 in November of 1987. That bill had not been paid as of the date of the filing of the petition.

On February 1, 1988, Akkeron delivered to Sarno a document setting forth various disagreements between Akkeron and Sarno and asserting numerous demands for takeover by Akkeron of Sarno's interest in Better Care.

The largest creditor of Better Care at the time of the filing of the petition was Citicorp in the amount of $149,000. All payments due Citicorp were current as of the date of the filing of the petition.

The total balance due on the financing agreement with the First American Bank of DuPage, on a long-term basis, was $29,-000. The total balance due on the lease to Broadway Real Estate Corporation, on a long-term basis, was $14,000. At the time of the filing of the petition, Better Care had $7,300 in its account. There was no evidence as to the amount of the accounts receivable.

Paul Thurmon, one of the principals of Evans, Marshall & Pease, reviewed the records of Better Care. As of the time of the filing of the petition, February 22, 1988, the following were the creditors of Better Care.

1. Dr. Akkeron
2. Broadway Real Estate Corporation
3. Evans, Marshall & Pease
4. Citicorp
5. First American Bank of DuPage
6. Schiavoni Graphics
7. Chicago Tribune
8. Office Supply Company
9. Telephone Company
10. Sammons

The total debt from creditors six through ten was in the amount of $2,100. These constituted mainly trade creditors and were considered as operating expenses. There was no testimony, as to those creditors, regarding whether or not those bills were overdue. There was no testimony concerning any past history of those accounts.

The burden is upon the petitioning creditors to prove each and every element of their case, including the following:

a) That they constitute a sufficient number of creditors holding claims in a sufficient amount to confer jurisdiction upon this court to sustain an involuntary petition as required by 11 U.S.C. Section 303(b);

b) That their claims are not contingent as to liability or the subject of a bona fide dispute; and

c) That as of the filing of the petition the alleged debtor was generally not paying its debts which are not subject to bona fide disputes as they become due.

A claim is contingent as to liability if the debtor will be called upon to pay the debt only upon the happening of an extrinsic event and that event was contemplated by the parties when the facts giving use to the claim arise. *In re All Media Properties, Inc.*, 5 B.R. 126, 133 (S.D.Tex.1980).

Considering all the facts, the court concludes that the Akkeron claim is a contingent claim. Akkeron is not eligible to be a petitioning creditor.

Since Dr. Akkeron is disqualified as a petitioning creditor there is no need for the court to decide whether his claim was also the subject of a bona fide dispute.

There remain two petitioning creditors, Evans, Marshall & Pease in the amount of $300, and Broadway Real Estate Corporation in the amount of $3,500, leaving an insufficient number of creditors and insufficient amount claimed under either Section 303(b)(1) or Section 303(b)(2).

As the petition cannot be sustained by the remaining creditors, the court need not decide any other issues regarding the claims of these entities.

The determination of whether the alleged debtor was generally paying its uncontested debts as they became due involves a two-step process: First, the court must determine which of the alleged debtor's debts were and were not being timely paid as of the filing of the petition. Second, the court must compare the number and amount of the unpaid debts, in light of the materiality of the non-payment, and also the general conduct of the alleged debtor's financial affairs. *Boston Beverage Corp. v. Turner*, 81 B.R. 738, 742 (D.C.D.Mass.1987).

When determining whether the alleged debtor was generally paying its debts as

they became due, some courts have excluded small debts which were not paid because they were overlooked by the alleged debtor. *In re Hill,* 8 B.R. 779, 781 (D.C.D. Minn.1981).

The court may refuse to consider as past due any debt not paid in strict accordance with the terms of the parties' agreement if there is a history of late payments having been accepted. *In re Ramm Industries, Inc.,* 83 B.R. 815 (M.D.Fl.1988).

The testimony as to the debts of, and the payments made by the alleged debtor was scant. The testimony chiefly concerned the debts owed the three petitioning creditors. The court has found the claim of Akkeron to be contingent. The claim of Evans, Marshall & Pease is a relatively small debt. Although there was an allegation that certain payments on the leased equipment had been made late, it was shown that the creditor accepted the payments without even assessing any late charges.

Not a scintilla of evidence was offered as to a general default by the alleged debtor in the payment of its obligations. There was no evidence that the debtor was not paying any recurring expenses such as utility bills, or even that they were being paid late. There was no evidence that debts were past due for an extended period of time. The question of "... *generally* not paying ..." (§ 303(b)(2), emphasis added) was never addressed by petitioner's evidence.

There was simply insufficient evidence as to the alleged debtor's debt structure and financial affairs for the court to even apply any appropriate tests. For a discussion of factors considered and tests applied by other courts, see *In re Dakota Lay'd Eggs,* 57 B.R. 648 (Bankr.D.N.D.1986), *In re Arriola Energy Corp.,* 74 B.R. 784 (Bankr.S.D.Tex.1987), *In re CLE Corp* 59 B.R. 579 (Bankr.N.D.Ga.1986), and *In re All–Media,* 5 B.R. 126 (Bankr.S.D.Tex. 1980), as well as cases previously cited herein.

This cause should be dismissed because the petitioning creditors failed to prove that Better Care was not generally paying its uncontested bills as they became due.

Even if the two previously discussed criteria had been met, the court should abstain from entering relief in an involuntary case and dismiss the petition if to do so would be in the best interests of the creditors and debtors. 11 U.S.C. Section 305, *Matter of Investment corporation of North America,* 39 B.R. 758 (S.D.Fl.1984), *Matter of Win–Sum Sports, Inc.,* 14 B.R. 389 (D.Conn.1981), *In re Beacon Reef Ltd. Partnership,* 43 B.R. 644, 11 C.B.C.2d 1283 (Bankr.S.D.Fl.1984). These courts have applied Section 305 to dismiss cases where petitioning creditors attempted to use the Bankruptcy Court to resolve an intra-company dispute, or a dispute as to the management and control of the business.

Dr. Akkeron is dissatisfied with his relationship with Ms. Sarno and is concerned that the bills of the alleged debtor may be paid in a manner he considers unfair because of his personal guarantees of two Better Care debts. These are concerns which would more properly be addressed in the state court. There is no evidence that Better Care is treating any class of creditors unfairly, that the assets of Better Care are being dissipated or that the Better Care creditors would benefit from further bankruptcy proceedings. The court notes that none of the Better Care trade creditors have joined in the petition or appeared to voice any objections to the manner in which Better Care has handled its financial affairs. Under these circumstances, the court could dismiss the petition pursuant to 11 U.S.C. Section 305.

For all the reasons stated herein, the court will, by the entry of a separate order, dismiss the involuntary petition under 11 U.S.C. 303.