119 F.3d 1485
 47 Fed. R. Evid. Serv. 670, 11 Fla. L. Weekly
Fed. C 349
GENERAL TRADING INCORPORATED,
Plaintiff-Counterclaim-Defendant-Appellant-Cross-Appellee.
v.
YALE MATERIALS HANDLING CORPORATION,
Defendant-Counterclaim-Plaintiff-Appellee-Cross-Appellant,
Jose M. Baeza, Sr., Counterclaim Defendant-Appellant,
Jose M. Baeza, Jr., Et Al., Counterclaim Defendants.
GENERAL TRADING INCORPORATED,
Plaintiff-Counterclaim-Defendant-Appellant,
v.
YALE MATERIALS HANDLING CORPORATION,
Defendant-Counterclaim-Plaintiff-Appellee,
Jose M. Baeza, Sr., Counterclaim Defendant-Appellant,
Jose M. Baeza, Jr., Et Al., Counterclaim Defendants.
GENERAL TRADING INCORPORATED,
Plaintiff-Counterclaim-Defendant-Appellee Cross-Appellant,
v.
YALE MATERIALS HANDLING CORPORATION,
Defendant-Counterclaim-Plaintiff-Garnishor-
Appellant-Appellant-Cross-Appellee,
Gonzalez Trading, Inc., a foreign corporation, Jose M. Jose
Manuel Baeza, Sr., Jose M. Baeza, Jr., Javier
Baeza,
Counterclaim-Defendants-
Appellees-Cross-Appellants,
Power Depot, Inc., a Florida Corporation, Michele M. Baeza,
Involuntary Supplemental Defendant, Encarnacion
Gonzalez, Involuntary Supplemental
Defendant,
Garnishees-Appellees-
Cross-Appellants,
Ocean Bank, Ocean Bank of Miami, First Florida Savings Bank,
FSB, Barnett Bank of Broward County, N.A., Joe's
Rental, Inc., America Discount, Inc.,
G.T. Americas, Inc., Garnishees,
G. T. Corp., Garnishee-Appellee-Cross-Appellant,
Franchel Enterprises, Inc., Gary Gerrard, P.A., Garnishees,
GTE International Inc., Compania Dominicana de Telefonso, C.
Por. A., Intervenor-Defendants.
GENERAL TRADING INCORPORATED, Plaintiff-Appellant-Cross-Appellee,
v.
YALE MATERIALS HANDLING CORPORATION,
Defendant-Counterclaimant-Appellee-Cross-Appellant,
Gonzalez Trading, Inc., a foreign corporation,
Counterdefendant-Appellee-Cross-Appellant,
Jose Manuel Baeza, Sr., Counter-defendant-Appellant-Cross-Appellee,
Jose M. Baeza, Jr., Counterdefendant-Appellee-Cross-Appellant,
Power Depot, Inc., a Florida Corporation, Michele M. Baeza,
Involuntary Supplemental Defendant, Encarnacion
Gonzalez, Involuntary Supplemental
Defendant, Defendants,
Ocean Bank, Ocean Bank of Miami, First Florida Savings Bank,
FSB, Barnett Bank of Broward County, N.A., Joe's Rental,
Inc., America Discount, Inc., G.T. Americas, Inc., G.T.
Corp., Franchel Enterprises, Inc., Gary Gerrard, P.A.,
Greenberg, Trauig, Hoffman, Lipoff, Rosen & Quentel, P.A., Garnishees,
GTE International Inc., Compania Dominicana de Telefonso, C.
Por. A., Intervenors-Defendants,
James S. Feltman, Receiver.
 Nos. 93-4491, 93-5307, 94-4526 and 94-4686.
 United States Court of Appeals,
Eleventh Circuit.
 Aug. 22, 1997.
 
 Edelmiro Salas-Garcia, Miami, FL, Jacqueline M. Valdespino, Coral Gables, FL, Peter J. Yanowitch, Roy D. Wasson, Miami, FL, for General Trading Inc. & Baeza, Sr.
 Frederick D. Page, Philip A. Allen, III, Mershon, Sawyer, Johnston, Dunwoody & Cole, Miami, FL, Leslie W. Jacobs, Robert F. Ware, Thompson, Hines & Flory, Cleveland, OH, for Yale Materials Handling Corp.
 Peter J. Yanowitch, Miami, FL, for Javier Baeza, Michele Baeza, Encarnacion Gonzalez & Power Depot.
 Edelmiro Salas-Garcia, Miami, FL, for Gonzalez Trading & Jose M. Baeza, Jr.
 Appeals from the United States District Court for the Southern District of Florida.
 Before ANDERSON and EDMONDSON, Circuit Judges, and FAY, Senior Circuit Judge.
 ANDERSON, Circuit Judge:
 
 I. INTRODUCTION
 
 1
 This case involves numerous parties who assert claims and counterclaims which arise out of proceedings before the district court as well as before the bankruptcy court. Appellants/counter-appellees General Trading, Inc. (GTI) and Jose Baeza, Sr. (Baeza, Sr.), GTI's president and principal shareholder, originally brought suit against appellee/counter-appellant Yale Materials Handling Corporation (Yale) for terminating a franchise agreement in which GTI acted as a dealer in forklifts and parts manufactured and supplied by Yale. Yale counterclaimed, and added additional counter-defendants, Jose Baeza, Jr. (Baeza, Jr.) and Javier Baeza, both sons of Baeza, Sr., and Gonzalez Trading, Inc. (Gonzalez Trading), a Puerto Rican corporation of which Baeza, Sr. was president and principal shareholder.
 
 
 2
 Three months after the litigation commenced, Yale filed an involuntary bankruptcy petition against GTI, which was dismissed by the bankruptcy court. Ultimately, the district court suit was referred to a magistrate judge for completion of trial and final disposition. The magistrate judge, inter alia, found the following: Yale had not wrongfully terminated the franchise agreement, GTI had breached the franchise agreement; and, Yale had wrongfully filed the involuntary bankruptcy petition. Javier Baeza and Baeza, Jr. were not found liable to Yale.
 
 
 3
 Subsequent to the magistrate judge's final judgment, the magistrate judge granted Yale's motion to implead supplemental defendants (new transferees),[1] as well as Baeza, Jr., all of whom allegedly received fraudulent transfers from GTI and Baeza, Sr. After impleading the parties and holding hearings, the magistrate judge set aside a number of fraudulent transfers made to the new transferees. The new transferees, in withdrawing their motion for a new trial, submitted a written acceptance of judgment to the magistrate judge. Subsequent to accepting the magistrate judge's judgment, the new transferees challenged the magistrate judge's authority under 11 U.S.C. § 636(c); at this time, the original counter-defendants also asserted challenges to the magistrate judge's authority.
 
 
 4
 In this opinion, we address claims on appeal raised by the original parties to the suit in the district court, as well as claims raised by the new transferees who were impleaded in the supplemental proceedings.
 
 II. FACTS[2]
 
 5
 Yale is a manufacturer of forklifts and lift trucks. In November, 1978, Yale and GTI entered into a Dealer Marketing Agreement (DMA), whereby GTI was authorized to act as a dealer in forklifts and parts manufactured and supplied by Yale. GTI's franchise agreement was financed in two different ways: (1) GTI was able to purchase service parts and equipment from Yale on an open account; and, (2) Heller Financing Company (Heller) agreed to provide floor plan financing for general sales inventory.[3]
 
 
 6
 In December 1987, Yale canceled the franchise agreement with GTI for the following reasons: GTI was abusing Yale's special pricing practices[4]; GTI regularly and repeatedly submitted false warranty claims to Yale for repair work not actually performed, or for repairs not covered by a Yale warranty; and, GTI sold Yale forklifts on several occasions to customers representing the units to be new when in fact they had been used. In response, GTI immediately stopped payment on checks issued to Heller,[5] and refused to make any further payments to Yale on the open account. GTI refused to pay despite the fact that it continued to receive proceeds from prior and subsequent sales of its inventory of Yale forklifts and parts. As a result of GTI's default on the notes and Yale's termination of GTI as a dealer, Heller declared GTI in default under the Security Agreement, and exercised its right to force Yale to take an assignment of Heller's rights under the floor financing plan.
 
 
 7
 A. Underlying litigation in the district court
 
 
 8
 Shortly after the termination of the franchise agreement, in December 1987, GTI and its president and principal shareholder, appellant/cross-appellee Jose Baeza, Sr. (Baeza, Sr.) filed suit in state court for, inter alia, breach of the DMA by wrongful termination.[6] Because diversity jurisdiction existed, Yale removed the case to federal court where it asserted a number of counterclaims, including breach of the DMA through submission of false pricing and warranty claims; fraudulent conveyance of corporate assets which constituted secured collateral; and, failure to pay notes and monies when due on the open account. Yale later amended its counterclaim to add counter-defendants Javier Baeza, Baeza, Jr. (also known as Manny Baeza),[7] and Gonzalez Trading, a Puerto Rican dealership owned and controlled by Baeza, Sr. which sells a competing brand of forklift. Following the filing of the lawsuit, the district court issued a prejudgment writ of replevin for Yale forklifts and parts still remaining on GTI's' premises.
 
 
 9
 In 1990, the parties' claims were tried in a non-jury trial for over 13 days before a judge in the United States District Court for the Southern District of Florida. The presiding judge resigned before the case was completed, and the case ultimately was transferred to District Judge William J. Zloch.
 
 
 10
 B. Referral of underlying litigation to a magistrate judge
 
 
 11
 On August 30, 1991, the parties' attorneys attended a status conference with the new district court judge, and discussed the possibility of having the case referred to a United States magistrate judge. On November 20, 1991, the attorneys for Yale, as well as the attorneys for GTI, Gonzalez Trading, Baeza, Sr., Javier Baeza, and Baeza, Jr. attended a status conference before United States Magistrate Judge Ted. E. Bandstra, and presented a signed consent to the completion of the trial before a United States magistrate judge, pursuant to 28 U.S.C. § 636(c). At the conference, the attorneys stipulated to proceed in the manner provided by Amended Rule 63 of the Federal Rules of Civil Procedure. The preamble of the consent and stipulation listed GTI, Baeza, Sr., Javier Baeza and Yale, and the signature of these parties' attorneys appeared at the end of the document. After receiving the consent and stipulation, the magistrate judge stated that "apparently there is an agreed consent to have this case now be completed, not restarted, but completed before me. Is that correct?" Yale's attorney responded in the affirmative; no party objected to the magistrate judge's statement regarding consent.
 
 
 12
 Gonzalez Trading was not specified in the preamble; however, that company's attorney, as well as its corporate agent, Baeza Sr., was present at the status conference. In addition, Baeza, Jr. was not listed in the preamble of the consent and stipulation. At the status conference, the magistrate judge asked Baeza, Jr.'s attorney whether Baeza, Jr. would consent to reference of the completion of the bench trial before him. His attorney answered, "I don't think we have any problem with that. I think that's fine."[8]
 
 
 13
 On November 27, 1991, the district court issued an order of referral, whereby the "trial and final disposition" of the litigation was referred to a United States magistrate judge pursuant to 28 U.S.C. § 636(c) and pursuant to Rule 1(h) of the Magistrate Rules for the United States District Court, Southern District of Florida. In the order of referral, the district court stated that the consent and stipulation had been carefully reviewed, and was approved, ratified and adopted by the district court. Furthermore, the order of referral stated that any party objecting to the order "shall file said Objections with the Clerk of this Court, ... within seven (7) calendar days from the date of this Order. The failure of any party to file Objections to the contents or any provision of this Order shall be deemed a total waiver of the contents and provisions of this Order." (emphasis in original). No party filed objections to the referral within the specified time period.[9]
 
 
 14
 After the parties completed the trial, on September, 30, 1992, the magistrate judge ruled for Yale on GTI's wrongful termination claim based on his finding that GTI had repeatedly made false pricing requests and fraudulent warranty claims.[10] Yale was awarded $1,119,612 for GTI's breach of contract, and for various other commercial claims which it asserted. In addition, the magistrate judge found that Yale had filed the involuntary bankruptcy petition in bad faith, and awarded GTI punitive damages of $500,000 pursuant to 11 U.S.C. § 303(i)(1)(B), as well as attorney's fees and costs of $89,777, pursuant to § 11 U.S.C. § 303(i)(1)(A), and (B). Codefendants Javier Baeza, and Gonzalez Trading were not found to be liable. On April 28, 1993, the court entered an amended final judgment which, inter alia, entered judgment in favor of Yale and against GTI and Baeza, Sr. in the amount of $1,139,528; this amount included post-judgment interest. In addition, on November 10, 1993, final judgment in Yale's favor was entered for the additional amount of $2,279,181.36 against GTI and Baeza, Sr., for attorney's fees and costs incurred by Yale in the case.
 
 
 15
 C. Supplementary Proceedings & Impleader of Fraudulent Transferees
 
 
 16
 In conducting its discovery in aid of execution of the judgment, Yale uncovered a number of fraudulent transfers made by GTI and Baeza, Sr. subsequent to September 30, 1992, the date of the magistrate judge's memorandum opinion and order. On July 8, 1993, Yale filed an emergency motion with the magistrate judge, seeking to commence additional proceedings pursuant to Fed.R.Civ.P. 69, and Florida Statute 56.29, in aid of execution of the amended judgment. This motion requested that the magistrate judge ask the following parties to show cause why certain property which they received from GTI and/or Baeza, Sr. should not be subject to execution to satisfy Yale's judgment: (1) Javier Baeza; (2) Jose Baeza, Jr.; (3) Power Depot, a Florida corporation owned and operated by Javier Baeza; (4) Michele M. Baeza, the daughter of Baeza, Sr.; and, (5) Encarnacion Gonzalez, the ex-wife of Baeza, Sr. and mother of Javier Baeza, Baeza, Jr., and Michele M. Baeza. According to Yale, these parties had received assets from GTI and/or Baeza, Sr. in violation of Florida's Uniform Fraudulent Transfers Act (UFTA), Chapter 726, Florida Statutes, and/or in violation of Florida's bulk sales laws, Chapter 676, Florida Statutes. Yale's motion sought to set aside the transfers as fraudulent and sought the conveyance of the subject assets to Yale as partial payment of the final judgments entered by the magistrate judge's amended final judgment.
 
 
 17
 Yale's initial motion was denied by the magistrate judge, but Yale renewed the motion on August 30, 1993. On September 17, 1993, the magistrate judge granted Yale's motion, and impleaded supplemental defendants Michele M. Baeza, Encarnacion Gonzalez, and Power Depot (all of whom are referred to throughout this opinion as "new transferees") and ordered them to show cause as to why the subject assets should not be declared fraudulently acquired. In addition, the magistrate judge ordered counter-defendants Baeza, Jr. and Javier Baeza to show cause as to why they should not be subject to Yale's judgments to the extent that each participated in or benefited from the challenged transfers of property and subject assets.[11] All of the new transferees responded to the order to show cause prior to evidentiary hearings on Yale's motion for supplementary proceedings. In addition, all the new transferees filed proposed findings of fact and conclusions of law.
 
 
 18
 After holding evidentiary hearings the magistrate judge issued an order on February 25, 1994, which set aside or invalidated the following transfers:[12] Baeza, Sr.'s transfer of six lots of real property in Miami to Michele Baeza; Baeza, Sr.'s transfer of his 43 foot Bertram yacht to Baeza, Jr.; Baeza, Sr.'s attempt to transfer four lots in West Palm Beach to Javier Baeza; GTI's transfer of $550,000 to GT corporation (formerly Gonzalez Trading); GTI's payment of a bonus of $250,000 to Javier Baeza; and, GTI's payment of a bonus of $26,789 to Baeza, Jr. The magistrate judge concluded that Power Depot was not liable to Yale. On April 12, 1994, separate judgments were entered effectuating the magistrate's order.[13] Yale's objections to the magistrate judge's ruling regarding Power Depot are addressed in this appeal.[14]
 
 
 19
 After the magistrate judge entered final judgment, the new transferees filed motions for a new trial in connection with the supplemental proceedings. This motion was withdrawn, however, on April 8, 1994. In withdrawing their motion for a new trial, the new transferees submitted to the magistrate judge a written acceptance of judgment, in which they stated the following: "[t]o obtain peace of mind, and go about their business, without admission of any facts, they accept the Judgment entered in the case at bar, dated February 25, 1994.... "
 
 
 20
 D. Challenges to the magistrate judge's authority
 
 
 21
 On May 2, 1994, the new transferees filed a motion seeking an emergency hearing to vacate the final judgments of the magistrate, wherein they contended that they had not consented to the magistrate judge's authority as required under 11 U.S.C. § 636(c), and that the magistrate judge lacked the subject matter jurisdiction to enter judgments. GTI, Baeza, Sr., Baeza, Jr. and Gonzalez Trading also filed motions challenging the magistrate judge's authority. On May 10, 1994, the magistrate judge conducted a hearing on these parties' emergency motions; the motions were denied on May 23, 1994. The parties appealed the magistrate judge's May 23, 1994, order to this court; that appeal is addressed in this opinion.
 
 
 22
 At the same time that Baeza, Jr. and Gonzalez Trading filed their motion with the magistrate judge to determine whether he had jurisdiction, they also filed a motion with the district court to vacate the order of referral. On October 24, 1994, the district court issued an order denying Baeza, Jr. and Gonzalez's motion. In the order, the district court dismissed the motion for lack of jurisdiction because the issue of the magistrate judge's authority at that time was pending on appeal to this court. In the alternative, the district court found that Baeza, Jr. and Gonzalez Trading had consented to the magistrate judge's authority pursuant to 28 U.S.C. § 636(c). The district court's October 24, 1994, order was appealed to this court. On August 21, 1995, this court affirmed the district court's dismissal, stating that the district court "lacked jurisdiction to entertain appellants' motion to vacate the order of referral to the magistrate during the pendency before this Court of the parties' earlier appeals raising the issue of the magistrate's authority in this case."
 
 E. Bankruptcy Proceedings
 
 23
 On April 8, 1988, three months subsequent to the original litigation in the district court, Yale filed a petition for involuntary bankruptcy against GTI in the United States Bankruptcy Court for the Southern District of Florida, pursuant to Chapter 7 of the Bankruptcy Code, 11 U.S.C. § 303(a).[15] Shortly thereafter, Yale moved for relief from the automatic stay in the bankruptcy court so that it could pursue prejudgment remedies, such as the writ of replevin, in the district court action. That motion was granted.
 
 
 24
 On June 30, 1988, the bankruptcy judge dismissed the involuntary bankruptcy petition following a two-day trial. The bankruptcy court disregarded Yale's claim for inventory payments of approximately $491,000, as well as Yale's claim that GTI had used Yale collateral to pay other creditors, because it concluded that they were subject to a bona fide dispute in the district court action. Once these claims were excluded, the bankruptcy court found that the creditors who brought the involuntary petition had failed to prove that GTI was generally not paying its debts as they became due. In addition, the bankruptcy court concluded, inter alia, that the creditors could obtain adequate relief in the district court action, and that no special circumstances existed to warrant exclusive relief under the Bankruptcy Code. The bankruptcy court's dismissal was affirmed by the district court on May 26, 1989. Yale now appeals the district court's affirmance of the bankruptcy court's dismissal of the involuntary petition.
 
 
 25
 The question of whether Yale wrongfully filed the petition was not addressed by the bankruptcy court, and was reserved for a later determination. That issue was litigated before the magistrate judge along with the issues presented in the underlying litigation. In an opinion issued on September 30, 1992, the court found that Yale filed the involuntary bankruptcy petition in bad faith, and, pursuant to 11 U.S.C. § 303(i)(1)(A), and (B), awarded GTI punitive damages of $500,000 as well as attorney's fees and costs of $87,777. Yale's appeal of this ruling is also addressed in this opinion.
 
 III. ISSUES
 
 
 [16]
 
 
 
 
 26
 This court addresses the following issues raised on appeal: (1) whether counter-defendants GTI, Baeza, Sr., Gonzalez Trading, Baeza, Jr., as well as the new transferees, consented pursuant to 28 U.S.C. § 636(c) to proceed before the magistrate judge; (2) whether in the supplementary proceedings the magistrate judge erred in finding that new transferee Power Depot was not the recipient of a fraudulent transfer; (3) whether the magistrate judge erred in finding that Yale brought the involuntary bankruptcy petition in bad faith; and, (4) whether it was error for the district court to affirm the bankruptcy court's dismissal of the involuntary bankruptcy petition.
 
 IV. STANDARD OF REVIEW
 
 27
 With respect to the proceedings in the district court, this court reviews factual findings for clear error, and reviews application of law to those facts de novo. Lykes Bros., Inc. v. U.S. Army Corps of Engineers, 64 F.3d 630, 634 (11th Cir.1995). For a factual finding to be clearly erroneous, this court, after reviewing all of the evidence, must be "left with the definite and firm conviction that a mistake has been committed." Id. (quoting United States v. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).
 
 
 28
 With respect to the bankruptcy proceedings, this court conducts a de novo review of determinations of law, whether from the bankruptcy court or the district court. In re Bilzerian, 100 F.3d 886, 889 (11th Cir.1996). We review the bankruptcy court's factual findings, however, under the clearly erroneous standard. Id.
 
 V. DISCUSSION
 A. Whether 28 U.S.C. § 636(c)
 
 29
 was satisfied.
 
 
 30
 In order for a magistrate judge to oversee any or all proceedings in a nonjury civil matter, and to order the entry of judgment in the case, 28 U.S.C. § 636(c) requires the "consent of the parties."[17] This court has held that "[c]onsent must be 'clear and unambiguous,' and cannot be inferred from the conduct of the parties." Hall v. Sharpe, 812 F.2d 644, 647 (11th Cir.1987) (citing Adams v. Heckler, 794 F.2d 303, 307 (7th Cir.1986), and cases collected therein).
 
 
 31
 On appeal, GTI, Baeza, Sr., Baeza, Jr., Gonzalez Trading, as well as the new transferees--Javier Baeza, Michele Baeza, Encarnacion Gonzalez, and Power Depot--all contend that they did not consent to the magistrate judge as required by § 636(c), and therefore he lacked the authority and jurisdiction to enter final judgment or oversee the supplemental proceedings.[18] Because the context of consent for the original parties to the litigation is different from the new transferees, we address their claims separately.
 
 
 32
 1. Whether GTI, Baeza, Sr., Baeza, Jr. and Gonzalez Trading
 
 
 33
 consented to appear before the magistrate judge.
 
 
 
 [19]
 
 
 
 
 34
 After carefully reviewing the record, we readily conclude that there is ample evidence that GTI, Baeza, Sr., Gonzalez Trading, and Baeza, Jr. explicitly and unambiguously consented to appear before the magistrate judge. First, the attorneys for all four of these parties attended a status conference on November 20, 1991, where they presented to the magistrate judge a signed consent and stipulation to proceed before the magistrate judge to complete the trial.
 
 
 35
 While the preamble to the consent and stipulation only named Yale, GTI, and Baeza, Sr.,[20] and did not list Baeza, Jr. or Gonzalez Trading, their consent was clearly conveyed at the November 20, 1991, status conference. When Baeza, Jr.'s attorney was asked by the magistrate judge whether his client would consent to the completion of the trial before a magistrate judge, he answered, "I don't think that we have any problem with that. I think that's fine." Because "[t]here is no requirement [in § 636(c) ] ... that the consent to referral to a magistrate be in writing, [but] only that it be express and on the record," Baeza, Jr. clearly consented. Lovelace v. Dall, 820 F.2d 223, 226 (7th Cir.1987); King v. Ionization Intern., Inc., 825 F.2d 1180, 1185 (7th Cir.1987). With respect to Gonzalez Trading, even though it was omitted from the preamble of the written document, its attorney signed the consent. More important, the initial focus of the status conference was to ensure that there was proper consent to try the case before the magistrate judge. All parties were present; as to Gonzalez Trading, not only was its counsel present, but also present was Baeza, Sr., its president, principal shareholder and corporate agent. With all parties thus present and the consent issue expressly on the table, the magistrate judge stated on the record that: "apparently there is an agreed consent to have this case now to be completed ... before me. Is that correct?" Yale's attorney answered in the affirmative, clearly expressing the view of all present. We conclude that there was explicit and unambiguous consent by all present.
 
 
 36
 Moreover, we note that GTI, Baeza, Sr., Baeza, Jr., and Gonzalez Trading, all were directed by the district court in its order of referral to file any objections to the order of referral within seven days. A failure to object to the authority of a magistrate judge, especially when preceded by express consent to the magistrate judge (as we have found above), waives any constitutional right to an Article III judge. See Peretz v. United States, 501 U.S. 923, 935 n. 12, 111 S.Ct. 2661, 2669 n. 12, 115 L.Ed.2d 808 (1991) (where a party who had consented to a magistrate judge's authority to conduct voir dire of a jury in a felony case, and who did not object to the magistrate judge's authority, waived his constitutional right to an Article III judge; the Court further held that "defendants may waive the right to judicial performance of other important functions, including the conduct of the trial itself in ... civil proceedings").
 
 
 37
 Subsequent to consenting to the magistrate judge's authority, these parties participated in all the pre-trial and post-trial proceedings without objecting the magistrate judge's authority or jurisdiction; only when an adverse judgment was issued by the magistrate judge did the parties contest his authority. We find appellants' arguments that they never consented incredulous, and any argument that they were deprived of their constitutional right to an Article III judge was waived.[21]
 
 
 38
 2. Whether the new transferees consented to the supplemental
 
 
 39
 proceedings before a magistrate judge.[22]
 
 
 40
 Assuming arguendo that this court would require the consent of latecomers,[23] we find that the new transferees--Michele Baeza, Javier Baeza, Encarnacion Baeza, and Power Depot--also consented to the authority of the magistrate judge. A review of the record reveals that the transferees gave their consent to the magistrate judge's authority subsequent to the final judgment in the supplementary proceedings in the form of an acceptance of judgment. On April 8, 1994, the new transferees submitted a motion to withdraw their request for a new trial, and accepted the magistrate judge's judgment. Clearly encompassed in this acceptance of judgment is an acknowledgment of the new transferees' consent to the authority and jurisdiction of the magistrate judge. Because § 636(c) "does not require a specific form or time of consent or even that it be in writing," the new transferees' acceptance of judgment constituted consent. King, 825 F.2d at 1185; Smith v. Shawnee Library System, 60 F.3d 317, 321 (7th Cir.1995) ("A late-submitted consent is an unequivocal representation that the magistrate was acting with the parties' consent") (quotations omitted).
 
 
 41
 Finally, as was the case with GTI, Baeza, Sr., Baeza, Jr. and Gonzalez Trading, the new transferees' consent, when coupled with a failure to object to the magistrate judge's authority, waived any argument that they were deprived of their constitutional rights. See Peretz v. United States, 501 U.S. 923, 111 S.Ct. 2661, 115 L.Ed.2d 808 (1991).
 
 
 42
 B. Whether Power Depot's purchase of approximately
 
 
 43
 $1,185,000 in inventory and fixed assets from GTI
 
 
 44
 constituted a fraudulent transfer.
 
 
 45
 In conducting discovery in aid of execution of the judgment against GTI and Baeza, Sr., Yale uncovered a number of fraudulent transfers made by GTI and Baeza, Sr., between September 30, 1992, the date of the magistrate judge's opinion and order, and May 7, 1993, the day the amended final judgment against GTI and Baeza, Sr. was entered. After holding evidentiary hearings, the magistrate judge issued an order on February 24, 1994, which set aside or invalidated the following transfers:[24] (1) Baeza, Sr.'s transfer of six lots in Miami, Florida to his daughter Michele approximately ten weeks after the adverse September 1992 ruling; (2) Baeza, Sr.'s transfer in January 1993 of a 43' Bertram yacht to his son, Manny; (3) Baeza, Sr.'s January 1993 transfer of lots in West Palm Beach, Florida to his son Javier; (4) GTI's transfer between November 1992 and April 1993 of $550,000 to the GT corporation,[25] a family owned business of which Baeza, Sr. was an insider;[26] (5) GTI's payment of a "bonus" on December 17, 1992, to Javier Baeza of $250,000; and, (6) GTI's payment of a "bonus" of $26,789 to Manny Baeza on January 12, 1993. While the magistrate judge found that the aforementioned transfers constituted fraudulent conveyances, it did not find GTI's transfer of $1,185,000 in inventory and fixed assets to Power Depot to be a fraudulent transfer.
 
 
 46
 Power Depot was started on October 27, 1992,[27] by Javier Baeza, who had previously worked at GTI and was a director of GTI. Javier Baeza was Power Depot's only officer and its sole shareholder. Power Depot hired GTI employees, remained at GTI's old location, used many of GTI's suppliers, and maintained many of GTI's former customers. On appeal, Yale raises the following arguments: the assets and inventory which Power Depot bought from GTI were fraudulently transferred; Power Depot is the alter ego of GTI, and therefore liable for GTI's debts; and, the transfer at issue is void because it violated Florida's bulk sales laws.[28]
 
 
 47
 In deciding whether Power Depot was the recipient of fraudulent transfers, the magistrate judge applied Fla. Stat. § 56.29(6)(a), which governs supplementary proceedings. Section 56.29(6)(a) provides that a judgment creditor, in this case Yale, may reach any property to which the judgment debtor, GTI, transferred title within one year of service of process on him if the transferee is a relative, or is a person on confidential terms with the defendant.[29] See Allied Industries International, Inc. v. AGFA-GEVAERT, Inc., 688 F.Supp. 1516, 1520 (S.D.Fla.1988). Under § 56.29, GTI had the burden of proving that the transfer at issue was not made to delay, hinder or defraud Yale. In addition, to prove fraud "only a preponderance or greater weight of the evidence is required." Wieczoreck v. H & H Builders, Inc., 475 So.2d 227, 228 (Fla.1985) (quoting Rigot v. Bucci, 245 So.2d 51, 53 (Fla.1971)).
 
 
 48
 Also applicable to GTI's transfer to Power Depot is Florida's Uniform Fraudulent Transfer Act (UFTA), which provides in relevant part:
 
 
 49
 (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
 
 
 50
 (a) With actual intent to hinder, delay, or defraud any creditor of the debtor; or
 
 
 51
 (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
 
 
 52
 1. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
 
 
 53
 2. Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.
 
 
 54
 Fla. Stat. § 726.105(1). In determining "actual intent" under § 726.105(1)(a), the UFTA directs courts to consider whether any of the following "badges of fraud" are applicable to the transfer at issue:
 
 
 55
 (a) The transfer or obligation was to an insider.
 
 
 56
 (b) The debtor retained possession or control of the property transferred after the transfer.
 
 
 57
 (c) The transfer or obligation was disclosed or concealed.
 
 
 58
 (d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.
 
 
 59
 (e) The transfer was of substantially all the debtor's assets.
 
 
 60
 (f) The debtor absconded.
 
 
 61
 (g) The debtor removed or concealed assets.
 
 
 62
 (h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.
 
 
 63
 (i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.
 
 
 64
 (j) The transfer occurred shortly before or shortly after a substantial debt was incurred.
 
 
 65
 (k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.
 
 
 66
 While "[a] single badge of fraud may only create a suspicious circumstance and may not constitute the requisite fraud to set aside a conveyance, ... several of them when considered together may afford a basis to infer fraud." Johnson v. Dowell, 592 So.2d 1194, 1197 (Fla.Dist.Ct.App.1992) (citing Banner Constr. Corp. v. Arnold, 128 So.2d 893, 896 (Fla.Dist.Ct.App.1961)). Moreover, while the UFTA lists a number of badges of fraud, "[i]t is clear from the language of the Statute that in determining intent, consideration may be given to factors other than those listed." In re Miller, 188 B.R. 302, 306 (Bankr.M.D.Fla.1995) (citing Harper v. United States, 769 F.Supp. 362 (M.D.Fla.1991)). In addition, courts take into account "the particular facts surrounding the conveyance," and avoid determining in a vacuum the presence or absence of a debtor's actual intent to hinder or delay a creditor. Kirk v. Edinger, 380 So.2d 1336, 1337 (Fla.Dist.Ct.App.1980).
 
 
 67
 Finally, Fla. Stat. § 726.106 is potentially applicable to this case. That statute applies to transfers affecting present creditors, such as Yale, and does not require proof of fraudulent intent if: (1) the debtor was insolvent or became insolvent as a result of the transfer, and did not receive a reasonably equivalent value for the transfers; or, (2) the debtor made the transfer to an insider, and the insider had reasonable cause to believe that the debtor was insolvent. Id.
 
 
 68
 Applying Fla. Stats. § 56.29(6)(a), § 726.105 and § 726.106, the magistrate judge concluded that Power Depot had not been the recipient of a fraudulent transfer. We have serious doubts as to whether this finding by the magistrate judge was correct, and therefore vacate his finding on this issue.
 
 
 69
 The magistrate judge found the following factors to constitute badges of fraud: " GTI had been sued at the time of the transfer; the transfer was for value reasonably equivalent to the value of the assets; and GTI became insolvent shortly after these transfers." In addressing the badges of fraud which were not present, the magistrate judge, stated, inter alia, that "Power Depot was not an 'insider' to the transaction merely because Javier Baeza was its sole owner[,]" and that "the transfer did not represent all of the debtor's assets."
 
 
 70
 We are concerned with the magistrate judge's conclusion that the purchases by Power Depot of approximately $1,185,000 in inventory and fixed assets from GTI in conjunction with GTI's termination of business activities was for fair value. In addressing whether fair consideration was given, no mention was made of the good will which obviously was transferred. Also confusing was the fact that, while the court made the statement that GTI's property was sold for "equivalent value" and "at a profit," it nevertheless listed this factor as a badge of fraud.
 
 
 71
 We also question the magistrate judge's general conclusion that Power Depot was not an insider. While we recognize that technically under the Florida law Power Depot cannot be classified as an insider,[30] it is clear that in substance it was: Javier Baeza, who controlled Power Depot, was an insider to GTI (he was a director), and was the son of the person in control of GTI. A close relationship between a transferor debtor and a transferee is a factor equivalent to a badge of fraud which should be considered in determining fraudulent intent. Banner Constr. Corp., 128 So.2d. at 897; The Florida Bar v. Rood, 620 So.2d 1252, 1254 (Fla.1993); Harper, 769 F.Supp. at 367 (where the court held that "[l]ack of consideration for the transfer, a close family relationship between transferor and transferee, pending or threatened litigation, and insolvency or substantial indebtedness can indicate fraudulent intent"); Orlando Light Bulb v. Laser Lighting and Elec. Supply, Inc., 523 So.2d 740, 744 (Fla.Dist.Ct.App.1988) (close business relationship is a badge of fraud). The magistrate judge's opinion lacks language to indicate that he considered the fact that there was a close relationship between GTI and Power Depot.
 
 
 72
 In Banner Constr. Corp., the court concluded that "[t]he recognized indicia or badges of fraud include the fact that the parties to the disputed transfer are related, one to the other, by blood or marriage, or are associated in business." 128 So.2d. at 896. In that case, a third party claimant in a garnishment proceeding, Banner Construction Corporation (Banner), appealed a jury verdict in favor of the plaintiff-creditor A.F. Arnold (Arnold). Banner had received an assignment from Bruce Bowen, Inc., of sums due from a court judgment in Bruce Bowen Inc.'s favor. At trial, Arnold, the garnishing creditor, alleged that Banner's claim was made in order to divert funds from Arnold and to avoid payment. The reviewing court looked at what badges of fraud were sufficient to uphold the jury verdict. Id. at 895.
 
 
 73
 On appeal, the court considered the close relationship of the parties to the disputed transfer, Bruce Bowen, Inc. and Banner. Bruce Bowen, Inc., had been incorporated in 1953 and was made up of officers related by blood or marriage, and was owned by its president, Bruce Bowen. In the fall of 1954, the company suffered from financial difficulties. Id. In the summer of 1955, Banner was formed. Banner was capitalized by Bruce Bowen and his relatives, and Banner's original officers and stockholders were all related by blood or marriage. In upholding the jury's verdict, the court considered the following factors to be badges of fraud:[31]
 
 
 74
 The relationship of the interlocking directors and stockholders of Bruce Bowen, Inc., and Banner Construction Corporation, the precarious financial condition of the assignor, Bruce Bowen, Inc., and the capacity of Bruce Bowen as general manager and vice president of Banner and as president and sole owner of the stock of Bruce Bowen, Inc., ... constitute sufficient evidence to sustain the verdict of the jury.
 
 
 75
 Id. at 896. We think the facts of the present case closely resemble those in Banner Construction. Like that case, GTI's officers and directors are related, and Power Depot's president and sole shareholder, Javier Baeza, is an insider to GTI. In addition, like Banner, Power Depot was formed only a short time after GTI was suffering from financial difficulties; in this case GTI's financial problems stemmed from the multiple judgments entered against it in the district court.
 
 
 76
 In addition to the magistrate judge's failure to consider the "close relationship" badge of fraud, we find error with the court's application of Fla. Stat. § 726.105(2)(e), which directs a court to consider whether a transfer "was of substantially all of the debtor's assets." Here, the transfer of GTI's assets and inventory was in conjunction with GTI's termination of business activities. Based on the record before us, there is a strong probability that "substantially all" of GTI's assets and inventory were transferred: GTI was selling its assets and inventory at the time it was closing its doors for business, and Power Depot took over other significant parts of GTI's business, as Power Depot hired GTI employees, remained at GTI's old location, used many of GTI's suppliers, and maintained many of GTI's former customers. In his order, the magistrate judge concluded that "the transfer did not represent all of the debtor's assets." The conclusory language used by the magistrate judge, without further explanation, makes us question whether the magistrate judge raised the standard for finding a badge of fraud under Fla. Stat. § 726.105(2)(e), i.e., did he inquire into whether "substantially all," rather than "all" of GTI's assets had been transferred.
 
 
 77
 Finally, the particular circumstances surrounding this case give us cause for concern. Around the time that GTI was selling its assets and inventory to Power Depot, GTI and/or Baeza, Sr. made a total of six fraudulent transfers. Moreover, the magistrate judge found that subsequent to the September 1992 opinion against Baeza, Sr. and GTI, "Baeza, [Sr.] has gone to extreme lengths to exhaust his own personal wealth through acquisitions of expensive art work, multiple ocean cruises, sizeable entertainment expenses, gambling at high stakes, large charitable deductions and other spending activities allegedly resulting ... in his inability to satisfy Yale's judgments against him." The actions taken by GTI and Baeza, Sr. shortly after the adverse district court judgment indicate a clear pattern of fraud, and raise a substantial inference of an intent to hinder, delay, and defraud Yale. While we recognize that the magistrate judge was aware of the circumstances surrounding this conveyance, the magistrate judge's opinion leaves us with the impression that GTI's and Baeza, Sr.'s other actions were not taken into account in assessing whether GTI had fraudulently transferred its assets and inventory to Power Depot.
 
 
 78
 While we have serious concerns over whether the record supports the district court's conclusion that Power Depot's purchase of GTI's assets and inventory was not a fraudulent transfer, we decline at this point to reverse and render a decision for two reasons. First, this issue might be moot. Yale's judgment may have already been satisfied by the assets which the magistrate judge set aside in the transfers which he found to be fraudulent. Furthermore, if the transfer to Power Depot really was for fair value, that value would be in GTI, where Yale could reach it; there would be no need for a finding of fraudulent transfer. We have serious doubt, however, as to whether Power Depot paid the full value to GTI.[32]
 
 
 79
 In addition, before deciding this issue definitively ourselves, we would want more specific findings with respect to whether Power Depot really paid full value for the inventory and assets, as well as the good will. Furthermore, we would need the district court to reconsider whether "substantially all" of GTI's assets were sold to Power Depot. For the above reasons, we vacate the district court's decision, and remand for further proceedings not inconsistent with this opinion.
 
 
 80
 C. Whether the magistrate judge erred in finding that Yale
 
 
 81
 had filed the involuntary bankruptcy petition in bad faith.
 
 
 82
 Approximately three months after GTI filed suit against Yale, on April 8, 1988, Yale filed a Chapter 7 involuntary bankruptcy petition against GTI, pursuant to 11 U.S.C. § 303(a). On appeal, Yale challenges the magistrate judge's finding that it filed the involuntary petition in bad faith, and therefore was liable to GTI for $500,000 in punitive damages under 11 U.S.C. § 303(i)(2).[33] On appeal, Yale argues that the magistrate judge used the wrong standard in determining whether it acted in bad faith.
 
 
 83
 Because "bad faith" is not defined in the bankruptcy code, and because there is no legislative history addressing the intended meaning of this language, courts have used different approaches to determine whether a petition was filed in bad faith. Some courts have established an "improper purpose test," under which bad faith exists where the filing of the petition was motivated by ill will, malice or the purpose of embarrassing or harassing the debtor. In re Camelot, 25 B.R. 861, 864 (Bankr.E.D.Tenn.1982) (bad faith where motivation for filing involuntary petition was to "spitefully forestall the dissolution of the debtor corporation" and to frustrate the results of a state court proceeding); see In re Better Care, Ltd., 97 B.R. 405, 410 (Bankr.N.D.Ill.1989).
 
 
 84
 A second line of authority applies what is known as an "improper use" test, where bad faith exists "when a creditor's actions amount to an improper use of the Bankruptcy Code as a substitute for customary collection procedures." In re Better Care, Ltd., 97 B.R. at 410. An improper use includes instances where "a creditor uses an involuntary bankruptcy to obtain a disproportionate advantage to that particular creditor's position, rather than to protect against other creditors obtaining such a disproportionate advantage." Id. at 411.
 
 
 85
 The third line of authority analyzes the bad faith issue by reference to Bankruptcy Rule 9011, which is patterned after Fed.R.Civ.P. 11.[34] An analysis under Rule 9011 inquires into "a significant objective requirement bearing on the legal justification of a claim or defense: a reasonable inquiry into the facts and the law." In re Turner, 80 B.R. 618, 623 (Bankr.D.Mass.1987). In addition to requiring an objective inquiry, Rule 9011 requires a subjective inquiry as well: the bankruptcy proceeding cannot have been interposed for an improper purpose, "such as to harass, to cause delay, or to increase the cost of litigation." Rule 9011.
 
 
 86
 In finding that Yale had wrongfully filed the involuntary petition, the magistrate judge applied the subjective improper purpose test, and found that Yale filed the petition in bad faith. In concluding that Yale acted with "ill will, spite or malice," the magistrate judge noted, inter alia, that it had found GTI to be solvent, that Yale had received a personal guaranty from Baeza, Sr., and that Yale had the ability to recover damages in the district court case. On appeal, Yale argues that instead of using a subjective standard to determine bad faith, the magistrate judge should have made both an objective and subjective inquiry according to the standards set forth in Bankruptcy Rule 9011.
 
 
 87
 We need not decide what is the correct approach to determine bad faith, however, because we find that under any of the three enunciated tests, the magistrate judge's finding was clearly erroneous. While some of the facts point in the other direction, a careful review of the record leaves us firm in our conviction that Yale was primarily motivated, both objectively and subjectively, by proper purposes in bringing the involuntary petition.[35]
 
 
 88
 After carefully reviewing the record, we find that Yale's primary concern in filing the petition was to protect itself against other creditors' obtaining a disproportionate share of GTI's assets. This is a proper purpose for filing an involuntary petition. See In re Better Care, 97 B.R. at 411. There is ample evidence that GTI was preferring other creditors at Yale's expense. The evidence clearly shows that Yale had reason to believe that both GTI and its principal shareholder, Baeza, Sr., were liquidating all of Yale's secured collateral, and possibly liquidating GTI's other assets as well. In January 1988, an inspection of GTI's collateral revealed that GTI had sold at least 55 Yale forklifts since an October 1987 collateral audit of GTI. Most of the forklifts were sold to Gonzalez Trading, a Puerto Rican corporation owned by Baeza, Sr. GTI had not made remittance to Yale for any of these sales as required by the Financing and Security Agreement. In addition, at that inspection Baeza, Sr. informed Yale's credit manager, Leonard G. Thornborough, that GTI had deposited the proceeds from these sales into its own operating account at Ocean Bank of Miami, and used the sale proceeds to pay other creditors. In addition, Baeza, Sr. told Thornborough that he intended to continue selling Yale forklifts without remitting the proceeds to Yale, and, if necessary, he would take GTI into voluntary bankruptcy, retire from the business, and pursue GTI's lawsuit against Yale.[36] We think the above statements by Baeza, Sr. gave Yale reason to believe that their debts would not have been protected by the outcome of the lawsuit in the district court; had Baeza, Sr. carried out his threat to liquidate GTI entirely to deprive Yale of its money, Yale may not have been protected even if it prevailed in the district court.
 
 
 89
 Moreover, Yale had documentary evidence which gave it reason to believe that Baeza, Sr. intended to carry out his threat to deplete GTI of its assets, and give a disproportionate share of those assets to creditors other than Yale.[37] A schedule of GTI's secured and unsecured transactions between the end of 1987 and February 29, 1988, gave Yale reason to believe that GTI was wrongly liquidating secured assets, as well as dismantling GTI through corporate transfers.[38] That schedule revealed numerous transfers of large amounts of money, in multiples of at least $10,000, to GTI insiders and to non-insider, unsecured trade creditors. Of particular concern to Yale was the transfer of approximately $280,000 to Ocean Bank between January 5, 1988, and January 28, 1988.
 
 
 90
 Yale's counsel, Harold Moorefield, Jr,. testified that, based on his experience and research, many of the payments reflected in GTI's books constituted preference payments to non-insider creditors which could only be recovered by a bankruptcy proceeding.[39] Under the Bankruptcy Code, a trustee may avoid any non-insider preference payment made by a debtor only if the transfer of interest was made on or within 90 days before the date of filing of the petition. 11 U.S.C. § 547(b)(4)(A). Thus, Yale's decision to file the petition was partly motivated by a well-founded belief that it needed to fall within the 90 day preference period to enable it to reach back and recover money transferred by GTI to non-insiders.[40]
 
 
 91
 Finally, we think Yale was legally justified in filing the involuntary petition, as Yale had a reasonable basis in the law to think its petition would not be dismissed. The bankruptcy court's opinion indicates that Yale's petition was dismissed because it found that GTI was solvent; as a solvent debtor, GTI did not fall within the intendment of 11 U.S.C. § 303(h)(1), which allows courts to order relief in an involuntary proceeding only if the debtor is "generally not paying" its debts as they become due.[41] In determining GTI's solvency, the bankruptcy court excluded Yale's claims against GTI because it found those claims to be subject to a "bona fide dispute."[42] It is clear from the face of the bankruptcy court's opinion that, if Yale's claims had not been excluded as subject to a bona fide dispute, Yale would not have lost on the issue of whether GTI was generally not paying its debts;[43] as such, § 303(h)(1) would have been inapplicable and the bankruptcy court would not have been required to dismiss the petition.[44]
 
 
 92
 We want to underscore that Yale had a good faith basis in law and fact in believing that its petition would not be dismissed as a result of the existence of a bona fide dispute. Upon reviewing the bankruptcy court's order of dismissal, the district court recognized that "bona fide dispute" is not defined in the Bankruptcy Code, that no binding decision on this question exists, and that courts have used divergent tests to define this term. At issue was whether Yale's claims in the involuntary petition as well as the counterclaims it asserted in the district court, were separate from the claims asserted by GTI in its lawsuit in the district court. The district court affirmed the bankruptcy court's finding of a bona fide dispute.[45]
 
 
 93
 While we need not decide whether the district court's finding of a bona fide dispute was error,[46] we recognize that, in making its finding, the bankruptcy court, as well as the district court on review, chose not to follow a line of authority which holds that counterclaims only serve to diminish or set off the amounts owing on a claim, and do not render a petitioner's claim subject to a bona fide dispute. See In re Atwood, 124 B.R. 402, 409 (S.D.Ga.1991) (quoting In re Drexler, 56 B.R. 960, 969 (Bankr.S.D.N.Y.1986)) ("Generally, 'the debtor's assertion of a counterclaim, even if of substance, does not render the petitioner's claim the subject of a bona fide dispute.' "); In re Onyx Telecommunications, Ltd., 60 B.R. 492, 495 (Bankr.S.D.N.Y.1985); Harris v. Capehart-Farnsworth Corp., 225 F.2d 268, 270 (8th Cir.1955). If the courts below had followed this line of cases, the counterclaims asserted by Yale in GTI's lawsuit very likely would not have rendered Yale's claims in bankruptcy subject to a bona fide dispute. Assuming arguendo that those courts were correct in not following the above cases, the fact remains that Yale had a good faith and reasonable basis under the law to believe that its claims were not subject to a bona fide dispute. If either the bankruptcy court or the district court had been persuaded by the authority cited by Yale, it is probable that Yale's involuntary petition would not have been dismissed. Of course, if the petition was not dismissed, Yale could not under the Bankruptcy Code have been subject to the bad faith inquiry. See 11 U.S.C. § 303(i)(2). To hold Yale liable because it lost the bona fide dispute argument would be inappropriate.
 
 
 94
 Because the evidence overwhelmingly indicates that Yale had more than sufficient reasons to file the involuntary petition, and because Yale had a good faith basis in believing its petition would not be dismissed as a result of its claims being subject to a bona fide dispute, we reverse the magistrate judge's bad faith finding.
 
 
 95
 D. Whether it was error for the district court to affirm the
 
 
 96
 bankruptcy court's dismissal of the involuntary
 
 
 97
 bankruptcy petition.
 
 
 98
 From the representations made at oral argument, it appears likely that the issue of the bankruptcy court's dismissal of Yale's involuntary bankruptcy petition is moot. We therefore decline to resolve the issue. Should any party desire, the issue may be pursued by first seeking a resolution of the mootness issue in the district court. Then a new appeal to this court may be taken.
 
 VI. CONCLUSION
 
 
 [47]
 
 
 
 
 99
 For the foregoing reasons, we affirm the magistrate judge's May 23, 1994, order establishing that the original parties as well as the new transferees consented to proceed before him; we vacate the magistrate judge's finding that GTI's transfer of its assets and inventory to Power Depot was not fraudulent; and, finally, we reverse the magistrate judge's finding that Yale filed the involuntary bankruptcy petition against GTI in bad faith.
 
 
 100
 AFFIRMED IN PART, VACATED IN PART, and REVERSED IN PART.
 
 
 
 [1]
 The new transferees include the following parties: (1) Javier Baeza; (2) Power Depot, Inc. (Power Depot), a Florida corporation owned and operated by Javier Baeza; (3) Michele M. Baeza, the daughter of Baeza, Sr.; and, (4) Encarnacion Gonzalez, the ex-wife of Baeza, Sr. and mother of Javier Baeza, Baeza, Jr., and Michele M. Baeza
 
 
 [2]
 At times, this opinion directly quotes one or more of the courts below in reciting those facts which are undisputed
 
 
 [3]
 Heller provided financing to authorized retail Yale dealerships for the purchase of Yale products. In March 1986, GTI entered into a Financing and Security Agreement (Security Agreement) with Heller where Heller extended credit to finance GTI's acquisition of forklifts from Yale. In exchange, Heller had a security interest in GTI's inventory financed under the Security Agreement. Under the Security Agreement, if GTI failed to make payments, Heller had the right to assign to Yale all of its rights in the Security Agreement, after which all of GTI's duties and obligations under the Security Agreement would be owed to Yale
 
 
 [4]
 Under a "special pricing program," Yale lowered its standard wholesale price on a given forklift unit provided that certain requirements were met. Beginning in 1981, GTI routinely procured special pricing from Yale based upon false information involving sales to both real and nonexistent customers
 
 
 [5]
 On January 5, 1988, a GTI check in the amount of $57,565.08, made payable to Heller dated December 8, 1987, was returned unpaid by GTI's bank because GTI had stopped payment on the check. This check was payment for and remittance of proceeds from the sale of 10 Yale forklifts from GTI's inventory during or around November 1987. At about the same time, GTI stopped payment on a second check made payable to Heller in the amount of $1,116
 
 
 [6]
 GTI also brought suit for breach of fiduciary duty, tortious interference with a business relationship, and failure to dispose of secured collateral in a commercially reasonable manner
 
 
 [7]
 Yale's claim against Manny Baeza was severed from the litigation
 
 
 [8]
 The magistrate judge requested that Baeza, Jr.'s attorney put his oral consent in writing subsequent to the conference; however, written consent was never forthcoming
 
 
 [9]
 At a pretrial conference on January 16, 1992, which was attended by both Yale's and GTI's attorneys, the magistrate judge stated that "[t]he file will reflect that this bench trial ... [is] being consented in front of me, a magistrate judge, pursuant to 28 U.S.C. § 636(c)(1) and also Federal Rule of Civil Procedure 73(b)." No attorney objected to this statement
 
 
 [10]
 At oral argument, GTI and Baeza, Sr. conceded that they are not appealing the merits of the magistrate judge's decision
 
 
 [11]
 Because Javier Baeza had been severed from the original suit, we include him in our "new transferee" classification. While Yale's emergency motion alleged that Baeza, Jr. also had received fraudulent transfers, he is not classified as a new transferee, as he was a party throughout the original proceedings
 
 
 [12]
 The order also granted Yale's motion for the appointment of a receiver
 
 
 [13]
 Subsequent to the magistrate judge's final judgments, Yale and the Receiver filed a joint motion for contempt because the defendants and new transferees had evaded Yale's judgments. On March 10, 1995, the court conducted an evidentiary hearing on the joint motion, and neither GTI nor Baeza, Sr. made any response or offered any evidence in opposition to the motion for contempt. On March 23, 1995, the magistrate judge entered an order certifying facts for contempt and an order to show cause. Yale then filed an emergency motion with this court for a limited remand to permit the district court to proceed with a hearing on the contempt motion. On October 10, 1995, this court granted Yale's motion. On March 28, 1996, the district court issued an order imposing contempt sanctions
 
 
 [14]
 The new transferees do not appeal the merits of the magistrate judge's findings
 
 
 [15]
 Yale was joined in the petition by two other creditors of GTI, Richard Bandler Co., Inc., and International Brokerage, Inc. A fourth creditor, GTE International, Inc. and Compania Dominicana de Telefonos, C. Por, affiliated through common ownership, intervened the following month
 
 
 [16]
 While GTI and Baeza, Sr. initially raised a number of claims on appeal asserting error with the merits of the magistrate judge's October 2, 1992, order, those claims were abandoned later, and at oral argument GTI and Baeza, Sr. conceded that they no longer make these arguments. In addition, while GTI and Baeza, Sr. had appealed the magistrate judge's November 10, 1993, final judgment on attorneys' fees and costs, they no longer assert this claim. Accordingly, the aforementioned arguments are deemed abandoned. See Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1573 n. 6 (11th Cir.1989) (citing cases for this proposition)
 In addition, we note that Yale, in its briefs, has failed to adequately support its assertion that the magistrate judge should have addressed Counts 8, 9, 14, 15 and 16. Those assertions are deemed abandoned.
 
 
 [17]
 Section 636(c)(1) of Title 28 of the United States Code, the provision which is at issue in this case, states the following:
 Notwithstanding any provision of law to the contrary--... Upon the consent of the parties, a full-time United States magistrate or a part-time United States magistrate who serves as a full-time judicial officer may conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case, when specially designated to exercise such jurisdiction by the district court or courts he serves.
 In addition to consent, § 636(c) also requires that the magistrate judge be specifically designated by the district court. In this case, the district court's November 27, 1991 order of referral clearly satisfies this requirement.
 
 
 [18]
 In arguing that the magistrate judge erred in denying their motions to vacate the final judgment for lack of jurisdiction, these parties also argue that the magistrate judge failed to follow the mandate issued by this court on August 21, 1995. In this court's August 21, 1995, unpublished opinion, we affirmed the district court's dismissal of Baeza, Jr. and Gonzalez' motion to vacate the order of referral because the district court lacked jurisdiction. Citing United States v. Hitchmon, 602 F.2d 689, 692-94 (5th Cir.1979) (en banc), we found that the district court lacked jurisdiction to vacate the order of referral because the issue of the magistrate judge's authority at that time was pending on appeal before this court
 According to appellants, this court's August 21, 1995 opinion resolved the issue of whether the magistrate judge had jurisdiction, and res judicata precludes the retrying of this issue. Appellants entirely misinterpret this court's August 21, 1995, mandate, and we reject this argument as frivolous.
 
 
 [19]
 There is substantial question of whether these parties' briefs on appeal even raise the issue of consent. Because this issue is so readily resolved, however, we will assume arguendo that it was raised on appeal. These parties' argument asserting a need for consent by Richard Bandler & Co. is rejected as without merit and warranting no discussion
 
 
 [20]
 The preamble also listed Javier Baeza. Because he was severed from the underlying litigation, and was later impleaded as an involuntary supplemental defendant, we address the issue of whether he consented in our discussion of the new transferees' consent
 
 
 [21]
 Because the parties clearly consented to the authority of the magistrate judge, we do not decide today the issue of whether a failure to object to the magistrate judge results in waiver of the consent requirement of § 636(c)
 
 
 [22]
 Following the September 30, 1992 judgment, the new transferees were impleaded by the magistrate judge's order to show cause as to why the assets at issue should not be declared fraudulently acquired. On appeal, the new transferees argue that they should have been served with a summons and complaint, and that, because Yale's failed to do so, the court never obtained personal jurisdiction over them. We disagree
 Under Fed.R.Civ.P. 69, state law concerning supplementary proceedings to enforce a judgment will govern to the extent that it is not preempted by federal law. See Allied Indus. Int'l, Inc. v. AGFA-GEVAERT, Inc., 688 F.Supp. 1516, 1517 (S.D.Fla.1988), aff'd, 900 F.2d 264 (11th Cir.1990) (Table). Florida Statute 56.29 sets forth the procedures for impleading supplemental defendants. "Under decisional law interpreting section 56.29, the two jurisdictional prerequisites for supplementary proceedings are (1) an unsatisfied writ of execution, and (2) an affidavit averring that the writ is valid and unsatisfied along with a list of persons to be impleaded." Id. at 1518 (citing Wieczoreck v. H & H Builders, Inc., 450 So.2d 867, 871 (Fla.Dist.Ct.App.1984)). The new transferees have not argued that either of these jurisdictional prerequisites was not met. In fact, the new transferees cite Allied Indus. Int'l, and acknowledge that federal courts may implead for supplemental proceedings in aid of execution by order to show cause. They argue, however, that the proceedings were nevertheless defective because they were impleaded by a magistrate judge and not by a district court judge. In light of our finding infra that the new transferees expressly consented to proceed before the magistrate judge, and in light of the fact that they never objected to this, this argument is waived. Cf. Peretz v. U.S., 501 U.S. 923, 111 S.Ct. 2661, 115 L.Ed.2d 808 (1991).
 Moreover, we note that "[a] party that fails to raise a defense of lack of personal jurisdiction at the appropriate time is deemed to have conferred personal jurisdiction on the court by consent." Pardazi v. Cullman Medical Center, 896 F.2d 1313, 1317 (11th Cir.1990); see Fed.R.Civ.P. 12(h) (defense of lack of personal jurisdiction is a waivable defense).
 For the foregoing reasons, we reject the new transferees' argument that the manner in which they were impleaded was defective, and that the district court never obtained personal jurisdiction over them. The other arguments which the new transferees raise on appeal are without merit and warrant no discussion.
 
 
 [23]
 See, e.g., Caprera v. Jacobs, 790 F.2d 442 (5th Cir.1986) (consent of latecomers required for the magistrate judge to have jurisdiction); New York Chinese TV Programs v. U.E. Enterprises, 996 F.2d 21 (2d Cir.1993)
 
 
 [24]
 The magistrate judge found the above transfers to be fraudulent under one or more of the following Florida statutes: Fla. Stat. § 56.29(a), Fla. Stat. § 726.105(1)(a), and Fla. Stat. § 726.106. For a detailed discussion of these provisions, see the text of opinion, infra
 
 
 [25]
 This corporation was formerly Gonzalez Trading
 
 
 [26]
 Under Florida law, an individual is an insider to a debtor corporation if he or she is a director, officer, or person in control of the corporation. Fla. Stat. § 726.102(7)(b). Baeza, Sr. was an insider to GT corporation because he was the president and principal shareholder of the corporation
 
 
 [27]
 This was less than one month subsequent to the magistrate judge's September 30, 1992 opinion, where it held GTI and Baeza, Sr. liable for $1,139,528
 
 
 [28]
 Because of our disposition of the fraudulent transfer issue, we need not address Yale's alternative arguments that Power Depot was GTI's alter ego, and that Florida's bulk sales laws were violated
 
 
 [29]
 Specifically, § 56.29 states the following:
 When, within one 1 year before the service of process on him, defendant has title to, or paid the purchase price of, any personal property to which his wife, any relative, or any person on confidential terms with defendant claims title and rights of possession at the time of examination, the defendant has a burden of proof to establish that such transfer or gift from him was not made to delay, hinder or defraud creditors.
 
 
 [30]
 To be an insider to debtor GTI, a person or an entity must be one of the following: (1) a director of GTI; (2) an officer of GTI; (3) a person in control of GTI; (4) a relative of a general partner, director, officer or person in control of GTI; (5) a partnership in which GTI is a general partner; or, (6) a general partner in a partnership of which GTI is a general partner. § 726.102(7)(b)
 
 
 [31]
 We recognize that Banner Constr. Corp. was decided before the UFTA was passed. However, in passing the UFTA, the Florida legislature incorporated the legal and equitable principles of prior fraudulent conveyance law. See Advest, Inc. v. Rader, 743 F.Supp. 851, 852-53 (S.D.Fla.1990). Thus, we think it is appropriate to look at the legal analysis in Banner Constr. Corp. in applying and interpreting the UFTA
 
 
 [32]
 Indeed, if the transfer was not made for fair value, and if GTI was insolvent or became insolvent as a result of the transfer, no proof of fraudulent intent would be necessary to find a fraudulent transfer. Fla. Stat. § 726.106(1)
 
 
 [33]
 If an involuntary petition is dismissed without the consent of all the petitioners and the debtor, and if a debtor does not waive the right to judgment, a court may grant judgment against any petitioner if it finds the petition was filed in bad faith; either damages proximately caused by the filing, or punitive damages can be awarded for the wrongful filing of a petition. 11 U.S.C. § 303(i)(2). Specifically, § 303(i)(2) states the following:
 If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment ...
 against any petitioner that filed the petition in bad faith for--
 (A) any damages proximately caused by such filing; or
 (B) punitive damages.
 
 
 [34]
 Rule 9011 provides the following:
 The signature of an attorney or a party constitutes a certificate that the attorney or party has read the document; that to the best of the attorney's or party's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law; and that it is not interposed for any improper purpose, such as to harass, to cause delay, or to increase the cost of litigation.
 
 
 [35]
 We recognize that the magistrate judge's finding relied on some facts which indicate that Yale may have acted with ill will in filing the petition. Nevertheless, we find that Yale had a plausible explanation for most of the facts relied on by the magistrate judge in finding bad faith. For example, the magistrate judge found suspect Yale's refusal of GTI's offer to allow Yale to repurchase its inventory. Under the DMA, however, Yale was under no obligation to repurchase any of its products because GTI had defaulted. Moreover, Yale did not know the value of this collateral, or its condition at the time. The magistrate judge also questioned Yale's abrupt termination of the DMA. Yet even the magistrate judge concluded that none of Yale's actions had constituted a breach of the DMA
 
 
 [36]
 Thornborough's affidavit containing Baeza, Sr.'s statements did not contain hearsay. This evidence was admissible because it was not offered to prove the truth of the matter asserted, but instead to indicate Yale's reasons for wanting to protect its rights in bankruptcy. Moreover, we find these statements constitute an admission. See Fed.R.Evid. 801(c), (d)(2)
 
 
 [37]
 We recognize that the magistrate judge considered the fact that Yale had other avenues with which to collect its claims. We find, however, that Yale was reasonable to think its claims nevertheless would be inadequately protected. For example, even though Yale had received a personal guaranty from Baeza, Sr., Baeza, Sr.'s statements to Thornborough gave it reason to believe that Baeza, Sr. would make this protection inadequate. Indeed, hindsight reveals that Baeza, Sr. did just that. After judgment was entered against him in the lawsuit, Baeza, Sr. declared his own insolvency despite a personal net worth of over five million dollars as recently as 1992. In addition, Baeza, Sr. made numerous fraudulent transfers to avoid the May 7, 1993 judgment entered against him by the magistrate judge. The opinion setting aside the transfers noted that, "[s]ince [September 1992 when the court found Baeza, Sr. personally liable to Yale], Baeza [Sr.] has gone to extreme lengths to exhaust his own personal wealth through acquisitions of expensive art work, multiple ocean cruises, sizeable entertainment expenses, gambling at high stakes, large charitable deductions and other spending activities allegedly resulting in his present insolvency and inability to satisfy Yale's judgments against him in this case."
 
 
 [38]
 Moreover, Yale had reason to believe that possible preference payments or possible fraudulent transfers were being made from GTI to GTI insiders. For example, on or between January 5 through January 7, 1988, GTI cashed three $100,000 certificates of deposit (CDs) which served to collateralize a loan from Ocean Bank. At trial, Yale presented evidence which gave it reason to believe that almost immediately after the CDs were cashed, GTI distributed the proceeds to Baeza, Sr. and his sons, Baeza, Jr. and Javier Baeza, and that the new CDs were repledged in Baeza, Sr. and his sons' names to Ocean Bank. This was significant to Yale because Ocean Bank was no longer a secured creditor of GTI, and the payments by the Baezas to Ocean Bank potentially could be recovered as preference payments to a non-insider. See note 39, infra, for a discussion of what constitutes a preference payment
 
 
 [39]
 A preference payment is a transfer for the benefit of a creditor for or on account of an antecedent debt made on or within 90 days of the filing of the petition, where the transfer enables the creditor to receive more than it would be entitled to under a Chapter 7 proceeding. 11 U.S.C. § 547(b); In re Jet Florida Systems, Inc., 861 F.2d 1555 (11th Cir.1988)
 
 
 [40]
 In contrast to the 90 day time limit for creditors to recover preference payments to non-insiders, preferential transfers to insiders may be voided for up to one year prior to filing the petition. 11 U.S.C. § 547(b)(4)(B). On appeal, GTI argues that the appropriate "reach back" period to avoid transfers to Baeza, Sr. or his sons would have been one year, rather than 90 days, as a result of Yale's personal guaranty from Baeza, Sr. While such transfers may have been avoidable preference payments for up to one year, not all of the transfers with which Yale was concerned were made to insiders
 
 
 [41]
 In determining whether a debtor is generally paying its debts as they become due, courts "compare the number of debts unpaid each month to those paid, the amount of the delinquency, the materiality of the non-payment, and the nature of the [d]ebtor's conduct of its financial affairs." In re Leek Corp., 52 B.R. 311, 314 (Bankr.M.D.Fla.1985). Yale was GTI's dominant creditor. Because a significant percentage of GTI's debts were to Yale, clearly the exclusion of Yale's debts was critical to the bankruptcy court's solvency determination
 
 
 [42]
 Section 303(h)(1) excludes debts which are the subject of a bona fide dispute from a court's determination of whether a debtor is "generally not paying" its debts as they become due. In addition, § 303(b)(1) of the Bankruptcy Code provides that claims raised in an involuntary petition cannot be subject to a bona fide dispute
 
 
 [43]
 We note that the district court's decision affirming the bankruptcy court's dismissal also reflects this reasoning
 
 
 [44]
 We note that GTI's expert witness, Mark Bloom, agreed with this reading of the bankruptcy court's order of dismissal
 
 
 [45]
 The district court found the existence of a bona fide dispute under a standard different from the one used by the bankruptcy court. We express no opinion on the different standards applied by the courts below
 
 
 [46]
 As we state infra, we decline to resolve the issue of whether the district court erred in affirming the bankruptcy court's dismissal of Yale's petition because the issue may be moot
 
 
 [47]
 The motions challenging jurisdiction, which were carried with the case, are resolved in Part V(A) of this opinion